Filed 11/13/14

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| OVERSTOCK.COM, INC. et al., <br><br>     Plaintiffs and Appellants, <br><br> v. <br><br> THE GOLDMAN SACHS GROUP, INC. et al., <br><br>     Defendants and Respondents; <br><br> THE ECONOMIST NEWSPAPER et al., <br><br>     Interveners and Appellants. | A133487 <br><br> (San Francisco City & County Super. Ct. No. CGC07460147) |
| OVERSTOCK.COM INC. et al., <br>     Plaintiffs and Respondents, <br> v. <br> MERRILL LYNCH, PIERCE FENNER & SMITH INC. et al., <br>     Defendants and Appellants; <br><br> THE ECONOMIST NEWSPAPER et al., <br>     Interveners and Respondents. | A135180 <br><br> (San Francisco City & County Super. Ct. No. CGC07460147) |

## I. INTRODUCTION

In this consolidated appeal, we address two "sealing" orders. The first granted motions by defendants to seal documents submitted in connection with plaintiffs' efforts to file a Fifth Amended Complaint. The second denied, in substantial part, motions by defendants to seal documents submitted in connection with defense motions for summary

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III(D), III(E)(2)(a)–(c), (e) and III(F)–(G).

judgment. The second order overlapped the first, since the materials underlying the proffered amended pleading resurfaced in opposition to the summary judgment motions. Accordingly, the second sealing order is the trial court's final call as to the propriety of sealing these discovery materials, and the parties have ultimately focused on this order, as do we.

We affirm most of the trial court's sealing decisions. But there are key exceptions, a principal one being thousands of pages of documentation plaintiffs submitted to the court, but which they never cited and which were irrelevant to the issues raised by the summary judgment motions. Under the plain terms of the protective order in place, these irrelevant materials never should have burdened the trial court or this court. Nor should they have been subjected to analysis under the sealing rules, since irrelevant materials have no bearing on the trial court's adjudicatory function and, thus, are not within the ambit of the public's right of access to court records. Rather, these discovery materials should have been struck from the record and remained confidential pursuant to the provisions of the protective order. As for the materials that were relevant to the summary judgment proceedings, some contain confidential financial information of third parties and should have been sealed under the sealed records rules.

On our way to reaching these conclusions, we address several issues pertaining to sealing orders that have remained unsettled, including the reach of California Rules of Court, rules 2.550 and 2.551, and media participation in sealing hearings. We also discuss tools available to the trial courts to deal with abusive litigation tactics impacting the handling of sealing issues. Indeed, we are appalled at the burden the parties foisted on the trial court here and view this case as a companion to the decision of our brethren in *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 289–290, decrying unnecessary and oppressive summary judgment tactics.

## II. BACKGROUND

Plaintiffs are Overstock.Com, Inc., an online retailer, and several of its investors. In their Fourth Amended Complaint, plaintiffs alleged defendants, Merrill Lynch, Pierce Fenner & Smith Inc. and Merrill Lynch Professional Clearing Corp. (collectively Merrill)

2

and Goldman Sachs & Co. and Goldman Sachs Execution & Clearing L. P. (collectively Goldman), intentionally depressed the price of Overstock stock by effecting "naked short sales"—that is, sales of shares the brokerage houses and their clients never actually owned or borrowed. This practice, plaintiffs claimed, artificially increased the supply and short sales of the stock, while decreasing its value. Plaintiffs alleged this conduct violated Corporations Code sections 25400 and 25500, Business and Professions Code sections 17200 and 17500, and New Jersey's RICO statute (N.J. Stat. 2C:41-2(c)–(d)).

**A.** *The Protective Order*

The parties' discovery demands were extensive, and in May 2008, pursuant to a stipulation, the trial court issued a protective order. The order allowed the parties to designate certain produced materials as "Protected Material," and to further classify this material as either "Confidential" or "Highly Confidential." Paragraph 13 of the order specified: "If a party seeks to file Protected Material, the party must seek to do so under seal pursuant to California Rules of Court 2.550 and 2.551."[1] Paragraph 14 required the parties to "endeavor in good faith to restrict their . . . submissions to Confidential Information . . . reasonably necessary for the Court['s deliberations]."

Two years later, in June 2010, the trial court entered a second protective order to "modif[y] and extend[] the [May 30, 2008]" order to confidential information pertaining to third parties. The parties acknowledged in this order that information identifying specific client transactions "may be protected by rights of privacy or other confidentiality rights." "[T]o avoid undue delay, burden, and expense in document production," the parties also agreed to "produce documents containing information of Third Parties without redaction of such information." We refer to both orders, collectively, as the protective order.

**B.** *The Proposed Fifth Amended Complaint and Related Motions to Seal*

In February 2011, defendants successfully demurred to the New Jersey RICO cause of action in the Fourth Amended Complaint. The trial court allowed plaintiffs to

---

[1] All further rule references are to the California Rules of Court.

propose a Fifth Amended Complaint with a reworked RICO claim, stating if they did so, the court would order an expedited briefing and hearing schedule. In May, plaintiffs submitted a proposed new pleading. The publicly filed document was heavily redacted; an un-redacted version was conditionally lodged under seal.

Defendants opposed allowing the Fifth Amended Complaint on three grounds: a California court should not apply New Jersey RICO law; plaintiffs had not, in any event, stated a claim under that law; and granting leave to amend so late in the case would prejudice defendants. The publicly filed opposition papers were redacted; un-redacted versions were conditionally lodged under seal. Plaintiffs then submitted papers in support of their proposed pleading, and defendants thereafter submitted reply papers. Again, the publicly filed documents were redacted; un-redacted versions were conditionally lodged under seal.

In connection with these substantive filings, defendants made ten separate motions to seal. Plaintiffs opposed five of the motions, including two motions to seal certain allegations of the proposed Fifth Amended Complaint based on discovery materials designated "Confidential" or "Highly Confidential" under the parties' protective order. Plaintiffs contended the allegations did not reveal trade secrets or implicate significant privacy interests. The media also filed, without court permission, opposition to the sealing motions, including requesting the court to unveil the "88 paragraphs of the proposed Fifth Amended Complaint" defendants wished to seal in whole or part.

After a lengthy hearing, the trial court ruled from the bench and denied leave to file the proposed Fifth Amended Complaint on two grounds: (1) granting leave to add a new, complex RICO claim would prejudice defendants on the eve of trial; and (2) the RICO claim "would be futile because the facts as alleged . . . do not warrant the application of New Jersey RICO [law] to this case under California choice-of-law principles."

Two days later, on August 3, 2011, the court issued a written order granting the motions to seal. It first determined the sealed records rules applied, and then made the express findings required under the rules and ordered the clerk to file, under seal, the un-

4

redacted materials that had been conditionally lodged with the court. The court also ruled the media had not sought to intervene in conformance with Code of Civil Procedure section 387 or under rule 2.551 and therefore denied intervention and struck the media's memorandum opposing sealing. The court noted, however, it had allowed the media to participate in the hearing. Plaintiffs and the media appealed (appeal No. A133487).[2]

## C. *The Summary Judgment Motions and Related Motions to Seal*

The following month, defendants moved for summary judgment on the remainder of plaintiffs' causes of action (under Corporations Code sections 25400 and 25500 and Business and Professions Code sections 17200 and 17500) on multiple grounds.

Plaintiffs' opposition would eventually fill 38 banker's boxes and included thousands of pages of discovery materials that had been designated "Confidential" or "Highly Confidential" pursuant to the protective order. The materials were ostensibly proffered to show defendants knowingly employed a strategy of naked short sales to devalue Overstock, and did so in California. The trial court, at the parties' urging, approved lodging all of these confidential materials conditionally under seal and deferring disposition of any sealing motions until after it ruled on the summary judgment motions.

The trial court heard three days of argument on evidentiary objections to the materials filed in connection with the summary judgment motions and a full day of argument on the merits of the motions. In an order dated January 10, 2012, the trial court granted the motions. As to the Corporations Code claim, the court ruled only conduct in California was actionable and plaintiffs "failed to raise [any] triable issue of material fact supportive of a finding that any act by any defendant foundational to liability, causation, or damages occurred in California." The court declined to reach any of the other grounds for judgment defendants had urged in connection with this claim. As to the Business and Professions Code claim, the court noted plaintiffs sought only injunctive relief and ruled

---

[2] Orders concerning the sealing and unsealing of documents are appealable as collateral orders. (*Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1064 (*Oiye*)); *Mercury Interactive Corp. v. Klein* (2007) 158 Cal.App.4th 60, 77 (*Mercury*).)

such relief was unavailable since defendants had ceased the complained-of conduct as of 2008, and it was not likely to recur given new Securities and Exchange Commission rules prohibiting it. Again, the court did not consider other grounds urged by defendants. The court issued a final, comprehensive order on April 11, setting forth, as required by Code of Civil Procedure section 437c, subdivision (g), "the evidence proffered in support of, and if applicable in opposition to, the motion which indicates that no triable issue exists."

Shortly after the initial summary judgment order in January, Merrill and Goldman each filed a motion to seal copious amounts of the materials plaintiffs had submitted in opposition to the summary judgment motions.[3] Plaintiffs opposed both motions. The media also sought, and was granted leave, to intervene in opposition to the motions.

After a lengthy hearing, the trial court largely denied the motions by written order filed March 6, 2012. The court again determined the sealed records rules applied. It also concluded the rules applied to all of the discovery materials submitted in connection with the summary judgment motions, not just those materials related to the limited grounds on which the court ultimately ruled. The court next concluded, as to a significant number of the materials, defendants' declarations were "conclusory" and "unpersuasive," and lacked the "specific facts" necessary to support sealing. The court additionally concluded plaintiffs had "persuasively show[n]" many of the documents no longer had sufficient indicia of confidentiality to warrant sealing. In sum, "[g]iven (1) that this case was filed in February 2007, more than five years ago, (2) that most, if not all, of the transactions reflected in the documents are at least four years old, (3) that many of the allegedly confidential business practices and trading strategies are outdated due to changes in federal law, and (4) that much of the material at issue was publicly disclosed at the January 5, 2012 hearing on the motions for summary judgment," the trial court observed, "defendants' failure to present specific facts to justify sealing the documents at issue is understandable."

---

[3] Defendants filed several other joint motions to seal portions of their moving and reply papers, but these motions and related orders are not at issue on appeal.

6

Still, the trial court ordered a significant number of the discovery materials sealed. These generally fell into three categories: (1) documents "laced with identifying information about hundreds of thousands of financial transactions of third parties who have no connection to this litigation"; (2) non-public regulatory documents having no direct connection to this action, the sealing of which plaintiffs did not oppose; and (3) approximately 200 exhibits plaintiffs submitted, but never cited.

While the March 2012 sealing order did not expressly revisit the 2011 order, when the trial court and parties discussed sealing the summary judgment materials at a December 8, 2011, case management conference, they agreed to a "holistic hearing that would apply not only to the [summary judgment sealing motions], but also would involve reconsideration of the court's previous sealing rulings." As the court observed, the "overlap is inseparable." At a later case management conference, on December 23, 2011, the court reiterated it was "prepared holistically to consider these sealing issues with respect to past and present and future motions at the same time" and again noted "the information that is sought to be sealed in the currently pending motions overlaps largely with the previous rulings." This holistic, evolving view of the propriety of sealing was well taken. (See *In re Marriage of Nicholas* (2010) 186 Cal.App.4th 1566, 1569 ["well-established constitutional, case, and statutory authority subject[s] sealing orders to continuing review and modification by the trial judge"].)

Merrill and Goldman filed notices of appeal to the extent the March 2012 order denied their motions to seal and allowed the media to intervene (appeal No. A135180), and we subsequently ordered the appeals consolidated. As we noted at the outset, the parties have focused on the 2012 order.[4]

---

[4] Plaintiffs and the media have not expressly abandoned their appeal from the 2011 order, and in their reply brief on appeal, plaintiffs' urge "[t]he proposed Fifth Amended Complaint should be filed in the public record." As to the discovery materials, however, none of the parties has identified any material covered by the 2011 sealing order not addressed by the 2012 order. Accordingly, we, like the trial court, take a "holistic," view of the sealing dispute in this case (see *In re Marriage of Nicholas, supra,* 186 Cal.App.4th at p. 1569), and our determination as to the propriety of sealing the

7

## III. DISCUSSION

### A. *Background: Access to Records in Civil Cases*

#### 1. *Common Law Right of Access*

Nearly all jurisdictions, including California, have long recognized a common law right of access to public documents, including court records. (See *Nixon v. Warner Communications, Inc.* (1978) 435 U.S. 589, 597 (*Nixon*) [it "is clear that the courts of this country recognize a general right to inspect and copy public records and documents"]; *IDT Corp. v. eBay, Inc.* (8th Cir. 2013) 709 F.3d 1220, 1222 (*IDT Corp.*) [noting most federal circuits have embraced a common law right of access to court records]; *Craemer v. Superior Court* (1968) 265 Cal.App.2d 216, 220, fn.3 ["right of a citizen to inspect public writings has its origin in the common law"].)

This common law right is effectuated through a presumption of access. (See *Nixon*, *supra*, 435 U.S. at p. 602 ["on respondents' side is the presumption—however gauged—in favor of public access to judicial records"].) As articulated by California's courts, this presumption means court records are "open to the public unless they are specifically exempted from disclosure by statute or are protected by the court itself due to the necessity of confidentiality." (*McGuire v. Superior Court* (1993) 12 Cal.App.4th 1685, 1687; accord, *Estate of Hearst* (1977) 67 Cal.App.3d 777, 782–783.)

The weight accorded to the common law presumption of access depends, in any particular case, on the "role of the material at issue in the exercise of . . . judicial power and the resultant value of such information to those monitoring the . . . courts. Generally, the information will fall somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance." (*Lugosch v. Pyramid Co. of Onondaga* (2d Cir. 2006) 435 F.3d 110, 119 (*Lugosch*).) Accordingly, when evaluating whether records should be sealed under the common law, courts engage in a balancing analysis, weighing the presumption of access against a variety of competing interests. (See *H.B. Fuller Co. v. Doe* (2007)

summary judgment materials covered by the 2012 order is controlling as to those materials initially addressed by the 2011 order.

151 Cal.App.4th 879, 894 (*H.B. Fuller*) [weighing harm of disclosing confidential information against any countervailing considerations].)

As a practical matter, this has meant documents subject to a protective order often remain outside public purview on a "good cause" showing akin to that which supported issuance of the protective order in the first place. (See *Phillips v. General Motors Corp.* (9th Cir. 2002) 307 F.3d 1206, 1213 ["When a court grants a protective order for information produced during discovery, it already has determined that 'good cause' exists to protect this information from being disclosed to the public by balancing the needs for discovery against the need for confidentiality."]; *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.* (11th Cir. 2001) 263 F.3d 1304, 1313 ["the Press's common-law right to the Firestone documents filed in connection with the motion for summary judgment may be resolved by the [Federal Rules of Civil Procedure, r]ule 26 good cause balancing test"]; *Mercury Interactive Corp. v. Klein* (2007) 158 Cal.App.4th 60, 107–108 (*Mercury*) [concluding discovery material was not protected by constitutional right of access and remanding for determination of whether documents should remain confidential under protective order].)

### 2.     *First Amendment Right of Access*

More recently, many jurisdictions, including California, have recognized a constitutional right of access to certain court documents grounded in the First Amendment. (*NBC Subsidiary (KNBC-TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1208, fn. 25 (*NBC Subsidiary*).)

*NBC Subsidiary* addressed the outright closure of court proceedings and concluded the trial court infringed on First Amendment rights by barring the media from the courtroom in the absence of explicit findings of an overriding interest that was likely to be prejudiced and could not be protected by less restrictive means. (*NBC Subsidiary, supra*, 20 Cal.4th at pp. 1222–1223.) However, the Supreme Court additionally observed, in what is now an oft-cited footnote, that: "Numerous reviewing courts likewise have found a First Amendment right of access to civil litigation documents filed in court as a basis for adjudication. (See *Brown & Williamson Tobacco Corp. v. F.T.C.*

9

(6th Cir. 1983) 710 F.2d 1165, 1179 (*Brown & Williamson*) [documents filed in civil litigation; '[i]n either the civil or criminal courtroom, secrecy insulates the participants, masking impropriety, obscuring incompetence, and concealing corruption']; *Rushford v. New Yorker Magazine, Inc.* (4th Cir. 1988) 846 F.2d 249 (*Rushford*) [summary judgment pleadings]; *Matter of Continental Illinois Securities Litigation* (7th Cir. 1984) 732 F.2d 1302 (*Continental Illinois Securities*) [records related to 'hybrid summary judgment motion']; cf. *Grove Fresh Distributors, Inc. v. Everfresh Juice Co.* (7th Cir. 1994) 24 F.3d 893 [assuming both a First Amendment and a common law right of access to civil litigation documents].)" (*NBC Subsidiary, supra,* 20 Cal.4th at p. 1208, fn. 25.)

Since *NBC Subsidiary*, the California courts of appeal have regularly employed a constitutional analysis in resolving disputes over public access to court documents. (E.g., *In re Marriage of Nicholas, supra,* 186 Cal.App.4th at p. 1575 [sealing orders implicate public's right of access under the First Amendment]; *Savaglio v. Wal-Mart Stores, Inc.* (2007) 149 Cal.App.4th 588, 596 (*Savaglio*) [public has First Amendment right to access civil litigation documents filed in court and used at trial or submitted as basis for adjudication].)[5]

Not all documents submitted or filed by the parties, however, fall within the ambit of the constitutional right of access. *NBC Subsidiary* hastened to add the courts have held "the First Amendment does not compel public access to discovery materials that are neither used at trial nor submitted as a basis for adjudication." (*NBC Subsidiary, supra,* 20 Cal.4th at p. 1208 fn. 25; see *Mercury, supra,* 158 Cal.App.4th at p. 84 ["our high court enunciated a rule under which a certain class of court-filed documents is subject to a presumption of a First Amendment right of public access"].)

---

[5] While most federal circuit courts of appeals have also recognized a First Amendment right of access to court documents, the United States Supreme Court has not yet done so. (See *Alvarez v. Superior Court* (2007) 154 Cal.App.4th 642, 654 ["the United States Supreme Court has not specifically extended the First Amendment right of access beyond judicial proceedings to judicial records"]; *IDT Corp., supra*, 709 F.3d at p. 1222 [same].)

Thus, "different levels of protection may attach to the various records and documents involved in [a given] case," depending on whether access is predicated on the First Amendment or the common law. (*Stone v. University of Maryland Medical System Corp.* (4th Cir. 1988) 855 F.2d 178, 180; see *United States v. McVeigh* (10th Cir. 1997) 119 F.3d 806, 812 ["both the common law and First Amendment standards ultimately involve a balancing test, and the First Amendment right of access receives more protection than the common law right. Thus, if we find the district court orders satisfy the First Amendment standard, as we do, we will necessarily find that the orders satisfy the common law standard as well."]; *Mercury*, *supra*, 158 Cal.App.4th at pp. 91, 106–107 [First Amendment applies to a "narrower class of filed documents," while "good cause" Civil Discovery Act[6] standard applies to discovery materials not subject to sealed records rules].)

### 3. *The Sealed Records Rules*

In response to *NBC Subsidiary*, the Judicial Council promulgated "the sealed records rules," rules 2.550, 2.551.[7] (*Mercury*, *supra*, 158 Cal.App.4th at p. 84.) The rules expressly implement the First Amendment principles espoused in *NBC Subsidiary* and establish a presumption that "court records . . . be open" unless the law requires confidentiality. (Rule 2.550(c); Advisory Com. com. to rule 2.550; *In re Marriage of Nicholas, supra,* 186 Cal.App.4th at p. 1575.)

The rules "apply to records sealed or proposed to be sealed by court order" (rule 2.550(a)(1)) and, more specifically, to "discovery materials that are used at trial or submitted as a basis for adjudication of matters other than discovery motions or proceedings." (Rule 2.550(a)(3).) The rules are inapplicable to "discovery motions and records filed or lodged in connection with discovery motions or proceedings." (*Ibid.*)

---

[6] Code of Civil Procedure section 2016.010 et seq.

[7] These rules replaced former rules 243.1 and 243.2 and "do not differ materially from the sealed records rules as originally adopted." (*Mercury*, *supra*, 158 Cal.App.4th at p. 68, fn. 1.)

Nor do they apply "to records that are required to be kept confidential by law."
(Rule 2.550(a)(2).)

### a. *Sealing Records*

"[S]ubject to certain exceptions . . . a court 'record must not be filed under seal without a court order.' (Rule 2.551(a).) Further, a 'court must not permit a record to be filed under seal based solely on the agreement or stipulation of the parties.' (Rule 2.551(a).)" (*Mercury*, *supra*, 158 Cal.App.4th at p. 84.)

"A party requesting that a record be filed under seal must file a motion or an application with an accompanied by a memorandum and a declaration containing facts sufficient to justify the sealing." (Rule 2.551(b)(1).) In so doing, the moving party must lodge with the court the record for which the sealing order is sought.[8] The court holds the record "conditionally under seal" until it rules on the motion or application. (Rule 2.551(b)(4).)

Often a party will want to file documents obtained during discovery that an adversary or third party has designated as confidential pursuant to a protective order. (See rule 2.551(b)(3).) In such a case, the party seeking to file the confidential documents must lodge them with the court in unredacted form, as well as lodge, in unredacted form, any pleadings, motions, memoranda or other court documents disclosing their contents. (Rules 2.551(b)(3)(A)(i), 2.551(d).) The party must also publicly file redacted copies of the documents and other court materials. (Rule 2.551(b)(3)(A)(ii).) In addition, the party must give written notice to whomever produced the confidential documents that the lodged, unredacted documents "will be placed in the public court file unless that party files a timely motion or application to seal the records under this rule." (Rule 2.551(b)(3)(A)(iii).) If the producing party is properly served with notice and fails to request sealing within 10 days, or fails to request an

---

[8] "A 'lodged' record is a record that is temporarily placed or deposited with the court but not filed." (*In re Providian Credit Card Cases* (2002) 96 Cal.App.4th 292, 311 (*Providian*).) "Filing a document makes it a part of the permanent court file, whereas lodging a document makes it only temporarily a court record." (*Mao's Kitchen, Inc. v. Mundy* (2012) 209 Cal.App.4th 132, 150–151.)

12

extension of time to seek sealing, "the clerk must promptly . . . place the [unredacted documents] in the public file." (Rule 2.551(b)(3)(B).)

The court may order a record sealed only upon making express findings that: "(1) There exists an overriding interest that overcomes the right of public access to the record; [¶] (2) The overriding interest supports sealing the record; [¶] (3) A substantial probability exists that the overriding interest will be prejudiced if the record is not sealed; [¶] (4) The proposed sealing is narrowly tailored; and [¶] (5) No less restrictive means exist to achieve the overriding interest." (Rule 2.550(d).) In its order, the court must identify the facts supporting its issuance. (Rule 2.550(e)(1)(A); *Mercury*, *supra*, 158 Cal.App.4th at p. 84.) The findings themselves, however, may be set forth in fairly cursory terms. (See, e.g., *McGuan v. Endovascular Technologies, Inc.* (2010) 182 Cal.App.4th 974, 988 (*McGuan*).) If the trial court fails to make the required findings, the order is deficient and cannot support sealing.[9] (See *Providian*, 96 Cal.App.4th at pp. 301–302.)

"If the court denies the motion or application to seal, the clerk must return the lodged record to the submitting party and must not place it in the case file unless that party notifies the clerk in writing within 10 days after the order denying the motion or application that the record is to be filed." (Rule 2.551(b)(6).)[10]

### b. *Unsealing Records*

The sealing rules also allow a party, members of the public, or even the court on its own initiative, to seek the unsealing of documents under seal. (Rule 2.551(h)(2).)

---

[9] If a party believes such findings are insufficiently detailed, as opposed to totally nonexistent, the party must raise the asserted deficiency in the trial court to ensure preservation of the right to challenge the sufficiency of the findings on appeal. (See *Oiye, supra,* 211 Cal.App.4th at pp. 1065–1066 [challenge to sealing findings forfeited; it is " 'clearly unproductive to deprive a trial court of the opportunity to correct such a purported defect by allowing a litigant to raise the claimed error for the first time on appeal' "].)

[10] Here, it appears the trial court simply ordered lodged documents publicly filed, rather than returned to the proffering party. This was without consequence, however, since plaintiffs both proffered the documents and opposed their sealing.

13

"Notice of any motion, application, or petition to unseal must be filed and served on all parties in the case." (*Ibid.*) "The motion, application, or petition and any opposition, reply, and supporting documents must be filed in a public redacted version and a sealed complete version if necessary" if such documentation reveals the content of the sealed documents. (*Ibid.*)

While the court must consider the same criteria pertinent to a motion to seal when ruling on a request to unseal (rule 2.551(h)(4)), an order to unseal—as well as an order denying sealing—does not require express factual findings by the trial court. (*Providian*, *supra*, 96 Cal.App.4th at p. 302.) The order must specify, however, whether the records are unsealed in whole or in part. (Rule 2.551(h)(5).)

### c. *Media's Involvement*

The sealed records rules expressly permit the public, which includes members of the press, to seek the *un*sealing of court records. (Rule 2.551(h)(2).) Rule 2.551 "provides procedural flexibility to third parties seeking to unseal court records, including"—in addition to noticed proceedings in the trial court—"the vehicle of initiating an original proceeding in the reviewing court by way of a petition for writ of mandate to compel the lower court to unseal records that were improperly sealed." (*Savaglio*, *supra*, 149 Cal.App.4th at pp. 601–603.) Rule 2.551(h)(2), thus, reflects the Judicial Council's implementation of *NBC Subsidiary's* admonition that " 'representatives of the press and general public "must be given an opportunity to be heard on the question of their exclusion." ' " (*NBC Subsidiary, supra,* 20 Cal.4th at p. 1217, fn. 36.)

Here the media asserts, as it has in other cases, that it also has a right to participate in proceedings to *seal* court records and further contends it is entitled to do so as an intervenor. And some cases have noted in passing the media was allowed to intervene to oppose a motion to seal. (E.g., *In re Marriage of Burkle* (2006) 135 Cal.App.4th 1045, 1050 (*Burkle*); *Fagan v. Superior Court* (2003) 111 Cal.App.4th 607, 611.)

However, after examining the nature and parameters of intervention, *Savaglio* concluded it was not the proper procedure for media participation, even in connection

14

with the unsealing of court records.  (*Savaglio, supra,* 149 Cal.App.4th at p. 602.)  The newspaper seeking leave to intervene in that case "mistakenly equate[d] intervention with pursuing a motion to seal.  They are not the same. The right to intervene, whether conditional or unconditional, is the right to become a party to pending litigation. As applied to matters of law, 'to intervene' means ' "[t]o interpose in a lawsuit so as to become a party to it." ' (*Estate of Ghio* (1910) 157 Cal. 552, 559–560.)  In civil law intervention is ' "[t]he act by which a third party becomes a party in a suit pending between other persons." ' (*Id.* at p. 560.)  By allowing a member of the public to file a motion to unseal records, rule 2.551(h) provides a mechanism for third parties to correct overbroad or unsubstantiated sealing orders, but it does not transform that member of the public into a party to the lawsuit." (*Savaglio*, at pp. 602–603.)

We agree with *Savaglio* that intervention pursuant to Code of Civil Procedure section 397 is not a means by which non-parties can participate in proceedings to seal or unseal court records.  This does not mean, however, media participation in proceedings to seal court records is improper, even though the sealing rules provide for participation only in proceedings to unseal court records.  The courts have ample authority to allow media participation as amicus curiae.  (See, e.g., *In re Marriage Cases* (2008) 43 Cal.4th 757, 791 [superior courts retain "broad discretion over the conduct of pending litigation" and have "the authority to determine the manner and extent of . . . entities' participation as amici curiae that would be of most assistance to the court"]; *Cromer v. Superior Court* (1980) 109 Cal.App.3d 728, 731 [court "aided by briefs of amici curiae representing interests of the news media and the public generally"]; *Apple Inc. v. Samsung Electronics Co., Ltd.* (Fed. Cir. 2013) 727 F.3d 1214, 1220 (*Apple Inc.*) [trial court denied motion to intervene on sealing issues, but both it and appellate court granted media leave to appear as amici].)

Here, the trial court rejected the media's attempt to intervene in connection with the sealing motions pertaining to plaintiffs' effort to file a Fifth Amended Complaint on the ground the media had not properly applied to intervene, but granted applications to intervene in connection with the sealing motions pertaining to defendants' summary

15

judgment motions. Allowing the media to intervene in connection with the second round of sealing motions was, for the reasons we have explained, improper. For the same reason, there is no merit to the media's claim the court erred in not allowing them to intervene in connection with the first round of sealing motions filed in connection with the proposed Fifth Amended Complaint. As to the initial motions, however, the media was essentially allowed to participate as amicus curiae, and it was not entitled to any other status.

## B. *Standard of Review*

### 1. *If Common Law Right of Access Applies*

When the common law right of access applies, appellate courts generally employ the abuse of discretion standard in reviewing sealing orders. (E.g., *Nixon*, *supra*, 435 U.S. at p. 599; *Ameziane v. Obama* (D.C. Cir. 2012) 699 F.3d 488, 494 ["we review a district court's decision to seal or unseal documents, or to issue or refuse to issue a protective order, for abuse of discretion" but "review de novo any errors of law upon which the court relied in exercising its discretion"]; *Media General Operations, Inc. v. Buchanan* (4th Cir. 2005) 417 F.3d 424, 429 ["Common law rights provide the press and the public with less access than First Amendment rights," and decision to seal or grant access to warrant papers " 'is committed to the sound discretion of the judicial officer who issued the warrant' " and "reviewed for abuse of discretion."].)

### 2. *If the Sealed Records Rules Apply (Constitutional Right of Access)*

When the constitutionally-based sealed records rules apply, the California courts have taken varying approaches to the standard of review.

In *Providian,* one of the early watershed cases applying the sealed records rules, the court reviewed an order *un*sealing documents, which it characterized as the "functional equivalent" of an order denying sealing. (*Providian, supra*, 96 Cal.App.4th at p. 302.) The court nevertheless addressed the standard of review both for orders sealing and unsealing records. (*Id.* at pp. 299–303.) Noting that an order sealing records is proper "only if [the trial court] expressly finds facts that establish" the five findings required by rule 2.550(d)(1)–(5), *Providian* concluded the first task in reviewing an order

to seal is to "examine the express findings of fact required by [the] rule . . . to determine if they are supported by substantial evidence." (*Providian*, at p. 302.) Next, because the language of the rule is permissive (the "court may order that a record be filed under seal" if the factual requisites are met (rule 2.550(d)), the appellate court must ask "whether, in light of and on the basis of [the] findings, the trial court abused its discretion in ordering a record sealed." (*Providian,* at p. 302.) As for an order to unseal, which differs from an order to seal because the trial court need not make express findings, *Providian* concluded the reviewing court examines the record for substantial evidence supporting the trial court's implied findings that the requirements for sealing are not met. (*Id.* at pp. 301–303.)[11]

However, in *People v. Jackson* (2005) 128 Cal.App.4th 1009, 1019–1020 (*Jackson*), the court took a different approach as to orders *sealing* court records, pointing out *Providian* actually dealt with an order unsealing records. *Jackson* concluded an order sealing records is subject to "independent review" because it implicates First Amendment rights.[12] (*Jackson*, at p. 1020; see also *United States v. Doe* (2d Cir. 2009)

---

[11] *Providian* thus leaves intact the trial court's discretion with respect to evidentiary rulings and gives due deference to the court's credibility determinations and resolution of conflicting evidence and inferences. (*Providian, supra*, 96 Cal.App.4th at p. 301.)

[12] *Jackson* relied on *Bose Corp. v. Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 499 (*Bose*), a defamation case, in which the Supreme Court observed " 'in cases raising First Amendment issues [the court] has repeatedly held that an appellate court has an obligation to "make an independent examination of the whole record" in order to make sure that "the judgment does not constitute a forbidden intrusion on the field of free expression." ' " (*Jackson*, *supra*, 128 Cal.App.4th at p. 1020.) *Jackson* also cited *In re George T.* (2004) 33 Cal.4th 620 (*George T.*), in which the California Supreme Court, citing to *Bose*, stated independent review is not limited to "specific First Amendment contexts." (*George T.*, *supra*, 33 Cal.4th at p. 632.) Rather, the heightened standard is broadly applied " 'both to be sure that the speech in question actually falls within the unprotected category and to confine the parameters of any unprotected category within acceptably narrow limits in an effort to ensure that protected expression will not be inhibited.' " (*Id.* at p. 633; see also *Bose*, *supra*, 466 U.S. at p. 508 [independent review serves goal of assuring proper "line" between protected and unprotected speech].) *George T.*, thus, independently considered whether the minor's poem constituted a

356 Fed.Appx. 488, 489 [distinguishing between orders sealing and unsealing records; "where, as here, we review a district court decision denying sealing, the decision presents no First Amendment concerns, and we will affirm unless the district court 'based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence' "].) As to orders *un*sealing court records, the court considered *Providian*'s standard of review discussion "arguably persuasive." (*Jackson*, at p. 1020.)

In *Oiye*, the court declined to follow *Jackson*'s view on the standard of review applicable to orders sealing court records and adopted the approach laid out in *Providian*, stating it would " 'review the trial court's decision to order the documents sealed under the abuse of discretion standard, and any factual determinations made in connection with that decision will be upheld if they are supported by substantial evidence.' " (*Oiye, supra*, 211 Cal.App.4th at p. 1067.) *Oiye* distinguished *Jackson* as involving an uncontested record. (*Oiye*, at p. 1067.) We do not agree *Jackson* employed independent review because the record was uncontradicted. Rather, it seems apparent the court did so because the sealed records rules are grounded on the First Amendment right of access.

We need not, however, resolve whether *Providian* or *Jackson* most accurately sets forth the standard of review for orders sealing court records. Although the trial court's first order granted defendants' motions to seal, its second order, embracing the same discovery materials, largely denied defendants' motions to seal, and only defendants have appealed from that order. Accordingly, the ultimate record status of the discovery materials at issue here is subject to review in the context of an order denying sealing. In this context, the courts have consistently employed the approach articulated in *Providian*. We therefore review de novo whether the sealed records rules apply to a given set of discovery materials (a question of law). And when they do, we determine whether substantial evidence supports the trial court's express or implied findings that the requirements for sealing are not met. (*Providian, supra*, 96 Cal.App.4th at pp. 301–303.)

---

criminal threat falling outside the protection of the First Amendment, and concluded it did not. (*George T.*, at p. 639.)

18

## C. *Applicability of the Sealed Records Rules to the Documents at Issue*

The sealed records rules apply, as we have discussed, to "discovery materials that are used at trial or submitted as a basis for adjudication of matters other than discovery motions or proceedings." (Rule 2.550(a)(3); *NBC Subsidiary*, *supra*, 20 Cal.4th at p. 1208, fn. 25.) While the first category of materials, discovery materials "used at trial," might relatively straightforward, the second category, discovery materials "submitted as a basis for adjudication," is not. Defendants contend the latter category embraces only materials relevant to the ground or grounds on which a trial court ultimately rules. Plaintiffs maintain it includes all discovery materials submitted to a court in support of and in opposition to a pending motion. We conclude the broader view is correct—with the important caveat irrelevant discovery materials or materials as to which evidentiary objections are sustained, are not "submitted as a basis for adjudication" and thus are not within the ambit of the constitutional right of access and, concomitantly, not subject to the sealed records rules.

### 1. *Discovery Materials "Submitted as a Basis for Adjudication"*

Defendants base their narrow reading of the phrase "submitted as a basis for adjudication" on *Mercury*. The issue in that case was whether exhibits to a complaint (obtained through discovery and subject to a protective order) were subject to the sealed records rules and properly ordered *un*sealed by the trial court. (*Mercury, supra,* 158 Cal.App.4th at pp. 68, 103.) After the defendants successfully demurred to the complaint solely on standing grounds, the media successfully urged that the complaint and exhibits be unsealed. (*Id.* at p. 71.) The Court of Appeal reversed, concluding the exhibits had not been submitted as a basis for adjudication and therefore were not subject to the sealed records rules. Accordingly, the materials should have remained sealed pending further proceedings to determine whether they were properly classified as confidential under the protective order. (*Id.* at pp. 105–108.)

*Mercury* posited two plausible meanings of the phrase "submitted as a basis for adjudication." (*Mercury*, *supra*, 158 Cal.App.4th at pp. 89–90.) Under a broad interpretation, "the right of access would apply to any discovery material filed with the

19

court, with the sole exception under rule 2.550(a)(3) of documents filed in connection with discovery motions or proceedings. Public access would be inherent in the mere filing of the discovery material because the placing of the document in the court file would make it potentially something that would be used 'as a basis for adjudication.' " (*Id.* at p. 89, fn. omitted.) Under a narrower view, discovery material would be "subject to public access (and therefore governed by the rules) when . . . filed with the court *and* . . . used in some manner by the court 'as a basis for adjudication' of a material controversy." (*Id.* at pp. 89–90, italics added;[13] see also *Rosado v. Bridgeport Roman Catholic Diocesan Corp.* (2009) 292 Conn. 1, 38–40 (*Rosado*) [postulating three views: a narrow approach that presumes access only to documents relevant to adjudication of a litigant's "substantive right," a middling approach that presumes access to all documents relevant to a court's adjudicatory function, and a broad approach that presumes access to all documents filed in connection with a pending matter].)

*Mercury* rejected the broader interpretation, stating "[i]t cannot be said that public access to *any* court-filed civil discovery documents—regardless of their relevance to the issues in the case, the circumstances of their filing, or the extent of their use in the proceedings—promotes" the objective of public access. (*Mercury*, *supra*, 158 Cal.App.4th at pp. 96–97.) "Public access to a discovery document that is not considered or relied on by the court in adjudicating any substantive controversy does nothing to (1) establish the fairness of the proceedings, (2) increase public confidence in the judicial process, (3) provide useful scrutiny of the performance of judicial functions, or (4) improve the quality of the truthfinding process." (*Ibid.*)

Thus, while recognizing "the importance of a complaint in framing the claims and issues presented in civil litigation," *Mercury* "disagree[d] that any material attached to

---

**13** The *Mercury* court also noted "a third potential interpretation," under which discovery material would be subject to access if "the filing party intends that it be used 'as a basis for adjudication' of some matter other than a discovery motion." (*Mercury*, *supra*, 158 Cal.App.4th at p. 90, fn. 26.) The court rejected this view because "such a standard requiring a determination of a litigant's intent would be cumbersome and would lead to uncertain and contradictory results." (*Ibid.*)

it—such as the discovery material designated confidential pursuant to a duly entered protective order here—necessarily is 'submitted as a basis for adjudication.' The pleadings, including complaints, are not typically evidentiary matters that are submitted to a jury in adjudicating a controversy." (*Mercury*, *supra*, 158 Cal.App.4th at p. 103.) The demurrer only addressed the threshold question of standing and "in no sense dealt with the underlying factual claims of stock options backdating alleged in the Complaint or concerned the exhibits appended to that pleading." (*Id.* at p. 104.) The court observed, however, "there may exist instances in which an attachment to a complaint to which a demurrer is interposed may constitute a document submitted as a basis for adjudication and thereby fall within the presumption of public access discussed in *NBC Subsidiary*. For instance, a challenged complaint in which a contract is attached and in which the demurrer concerns the viability of the contract would probably pose such a case." (*Id.* at p. 104, fn. 34.)

Defendants maintain *Mercury* sets forth a bright-line standard: confidential discovery material merely filed (or, more accurately, lodged) with the court, but not actually "considered or relied on" by the court in connection with the basis on which it rules, is not "submitted as a basis for adjudication" and, thus, is not subject to the sealed records rules. We do not agree *Mercury* can or should be boiled down to such a limited view.

*Mercury* involved the unsealing of exhibits to a complaint, challenged at the outset on a single, threshold procedural ground. While the complaint identified the claims to be tried, neither its substantive allegations, nor its exhibits, had been submitted to the court as a basis for adjudicating the merits of the case. Given these circumstances, *Mercury*'s discussion of the scope of the sealed records rules is on solid ground. However, the court was not confronted with, nor did it discuss, any other context, including discovery materials submitted in connection with a summary judgment motion seeking judgment on multiple, alternative grounds. Accordingly, *Mercury* does not answer the issue presented here.

21

We therefore turn to the language of the sealed records rules. Rule 2.550 applies to "discovery materials that are *used* at trial <u>or</u> *submitted* as a basis for adjudication of matters other than discovery motions or proceedings." (Rule 2.550(a)(3), italics and underlining added.) The plain language thus distinguishes between documents that are "used" at trial and documents that are "submitted" as a basis for adjudication of pretrial motions. Had the drafters intended to limit the applicability of the sealed records rules to only discovery materials "used by the court" in its ultimate disposition of substantive pretrial motions, they could have, and undoubtedly would have, said so. But they did not. Further, both the words "used" and "submitted," in context, most reasonably refer to the *parties'* conduct—that is, "used at trial" by the parties and "submitted as a basis for adjudication" by the parties. These words do not reasonably refer to the trial court's conduct, deciding on which ground, of several, to base its decision. In short, defendants' proffered construction of "discovery materials that are used at trial or submitted as a basis for adjudication" would require us to effectively delete the word "submitted" from the rule and insert in its place the phrase "by the court," an exercise in redrafting we decline to undertake. (See *Providian, supra,* 96 Cal.App.4th at p. 302 ["it is not our function to rewrite the rules"].)

As we have discussed, the language of rule 2.550 derives directly from *NBC Subsidiary's* footnote 25, which states "the First Amendment does not compel public access to discovery materials that are neither used at trial nor submitted as a basis for adjudication." (*NBC Subsidiary, supra*, 20 Cal.4th at pp. 1208–1209, fn. 25.) The Supreme Court cited several cases in support of this proposition; none suggests the constitutional right of access to court records is limited to discovery materials relevant to the ground or grounds on which on a court ultimately rules. (E.g., *Rushford, supra*, 846 F.2d at p. 253 ["the more rigorous First Amendment standard should also apply to documents filed *in connection with* a summary judgment motion in a civil case"], italics added.)

Additionally, we must heed the mandate of article I, section 3, subdivision (b)(1), of the California Constitution, which provides: "The people have the right of access to

22

information concerning the conduct of the people's business, and therefore, the meetings of public bodies and the writings of public officials and agencies shall be open to public scrutiny." (*Ibid.*) Subdivision (b)(2) expressly states, "[a] statute, court rule, or other authority, including those in effect on the effective date of this subdivision, shall be broadly construed if it furthers the people's right of access, and narrowly construed if it limits the right of access." (Cal. Const., art. I, § 3, subd. (b)(2).) Thus, unless we discern a clear requirement otherwise, we must interpret the sealed records rules broadly to further the public's right of access. (See *Sierra Club v. Superior Court* (2013) 57 Cal.4th 157, 166 [citing the constitutional provision and noting "our usual approach to statutory construction is supplemented by a rule of interpretation that is specific to the issue before us"]; *Savaglio, supra*, 149 Cal.App.4th at p. 600 ["Lest there be any question, Proposition 59 *requires us to broadly construe a statute or court rule* 'if it furthers the people's right of access.' "].)

Finally, defendants' narrow construction would necessarily mean sealing decisions would be made after-the-fact—that is, after the trial court issues its substantive ruling—because only then would the ground or grounds on which the court rules be known. This, in turn, would mean that until the court rules, documents would remain lodged and out of the purview of the public, and the public would necessarily have a constricted opportunity to observe the judicial process as it unfolded.

The plain language of the sealed records rules indicates, however, the drafters did not envision an inherently delayed resolution of sealing issues. The rules provide that upon notice by a party seeking to use confidential discovery materials, a party opposing disclosure must, within 10 days, file a motion or application to seal or obtain an extension of time to do so. (Rule 2.551(b)(3)(B).) Thus, the rules provide for prompt disposition of sealing issues in the first instance, while providing the flexibility to delay motions to seal through the granting of an extension. Given the short timeframe that governs absent an extension, we cannot read other language, and specifically the phrase "submitted as a basis for adjudication," in a way that necessarily delays the resolution of sealing issues until after a trial court rules on the merits.

23

Indeed, the courts have expressed concern about delayed rulings on sealing issues. (See *Mercury*, *supra*, 158 Cal.App.4th at p. 92 [approving of Seventh Circuit case stating " 'access should be immediate and contemporaneous' "]; *Savaglio, supra*, 149 Cal.App.4th at p. 601 ["any reading of rules 2.550 and 2.551 that encourages an open-ended time frame for filing a motion to seal records long after the underlying substantive matter has been decided would defeat the purpose of the rules"]; see also *Lugosch, supra,* 435 F.3d at p. 121 [concluding district court erred when it postponed sealing decision "until it had ruled on the underlying summary judgment motion"].)

We recognize some courts have adopted the view defendants urge—that the right of access pertains only to discovery materials relevant to the ground or grounds on which a court actually rules. (E.g., *In re Policy Management Systems Corp.* (4th Cir. 1995) 67 F.3d 296 (unpublished table case) [documents filed in connection with motion to dismiss "did not play *any* role in the district court's adjudication of the motion" and court "did not convert the motion into a motion for summary judgment, and thus excluded the documents from consideration"]; *Verona v. U.S. Bancorp* (E.D.N.C., Mar. 29, 2011, No. 7:09-CV-057-BR) 2011 WL 1252935 *1, *21 ["Although these documents were filed in support of the motions for summary judgment and reviewed by the court, the court did not rely upon them in reaching its decision. Accordingly, the court will not presume a public right of access to the documents and will allow the motion to seal."].) However, these courts did not engage in an extensive analysis of the issue. Nor were they required to heed our Supreme Court's discussion in *NBC Subsidiary's* footnote 25, bound by the language of the sealed records rules, or bound by article I, section 3, subdivision (b)(1) of the California Constitution.

We therefore reject the narrow definition of the phrase "submitted as a basis for adjudication" defendants urge and conclude it embraces discovery materials submitted in support of and in opposition to substantive pretrial motions, regardless of the ground on which the trial court ultimately rules.

## 2. *Irrelevant Materials Are Not "Submitted As a Basis for Adjudication"*

This does not mean the mere act of submitting discovery materials in support of or in opposition to a pretrial motion imbues the materials with constitutional import, triggering the sealed records rules.  As every court to consider the question has observed, the right of access applies only to discovery materials that are *relevant* to the matters before the trial court.  (See *Mercury*, *supra*, 158 Cal.App.4th at p. 96 [access to irrelevant documents does not promote goals of public access]; see also *United States v. Kravetz* (1st Cir. 2013) 706 F.3d 47, 59, fn. 9 [no presumptive access to "an irrelevant document, that neither was nor should have been relied on"]; *Apple*, *supra*, 727 F.3d at pp. 1222–1223 ["evidence which a trial court rules inadmissible—either as irrelevant or inappropriate—seems particularly unnecessary to the public's understanding of the court's judgment"]; *E.E.O.C. v. Dial Corp.* (N.D. Ill., Nov. 29, 2000, No. 99 C 3356) 2000 WL 33912746 *1, *1 ["public has no interest in gaining access to information that has failed to pass the threshold tests of relevance and admissibility"].)[14]

## 3. *Curbing Abusive Litigation Tactics Impacting Sealing Proceedings*

We are compelled at this juncture to address the negative impact abusive litigation practices have on sealing issues, a problem that is heightened, we acknowledge, by a

---

[14] See also *Newsday*, *supra*, 730 F.3d at page 167 [no First Amendment presumption of access unless "parties could reasonably have been expected to make" use of the document]; *United States v. Snyder* (N.D.N.Y. 2002) 187 F.Supp.2d 52, 62–63 [" 'mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject to the right of public access . . .  item filed must be relevant to the performance of the judicial function' "]; *G&C Auto Body Inc v. Geico General Ins. Co.* (N.D. Cal., Mar. 11, 2008, No. C06-04898 MJJ) 2008 WL 687372 *1, *2 [confidential financial information " 'irrelevant to the Court's resolution of the legal challenges' "]; *Young v. Actions Semiconductor Co., Ltd.* (S.D. Cal., July 27, 2007, No. Civ. 06CV1667-L(AJB)) 2007 WL 2177028 *1, *5 [to the extent not relevant to a motion to dismiss, "moving the court to review voluminous exhibits for purposes of sealing is an inefficient use of judicial resources"]; *Bridgeport Music, Inc. v. Smith* (E.D. Mich., Feb. 22, 2012, No. 03-cv-72211) 2012 WL 579710 *1, *6 ["72 pages of royalty statements" for clients other than client at issue were irrelevant]; *Cohen v. Gerson Lehrman Group, Inc.* (S.D.N.Y., Sept. 15, 2011, No. 09 Civ. 4352(PKC)) 2011 WL 4336679 *1, *2 [individual contact information, such as e-mail addresses, home addresses and phone numbers, not relevant and would remain redacted].

broad reading of the phrase "discovery materials . . . submitted as a basis for adjudication." (Rule 2.550(a); see *Rosado, supra,* 292 Conn. at p. 48 [broad presumptive access to documents "creates the potential for parties to harass others by attaching private material with little to no relevance to the issues to underlying motions, thus rendering that material public"].)

The problem is two-fold—parties who fail to exercise any discipline as to the confidential documents with which they inundate the courts, and parties who indiscriminately insist every document satisfies the rigorous requirements of the sealed records rules. This case exemplifies both.

Plaintiffs submitted a veritable mountain of confidential materials in opposition to defendants' motions for summary judgment.[15] Entire documents were submitted, when only a page or two were identified as containing matter relevant to the issues.[16] Multiple documents were submitted to support a claim, when one would have sufficed.[17] No

---

[15] The 95-volume appendix in the appeal from the 2012 sealing order (No. A135180) exceeds 22,000 pages. The 17-volume appendix in the appeal from the 2011 order (No. A133487) exceeds 4,375 pages. Plaintiffs' attempt at oral argument to brush aside the magnitude of their document dump, by claiming defendants' appeal implicates only two banker's boxes of the documents, is stunningly disingenuous, as was their assertion they were forced to over-document their summary judgment opposition in light of defendants' evidentiary objections, which, of course, were nonexistent at the time plaintiffs prepared and filed their opposing papers.

[16] For example, plaintiffs submitted large swaths of 16 deposition transcripts and all 791 of defendants' responses to requests for admission, but cited only minimal excerpts of the transcripts and a handful of mundane responses authenticating documents. They similarly submitted entire documents, but cited only a page or two, sometimes only a line or two. This glut of material was inexcusable—only the face sheets and handful of relevant pages of the deposition transcripts, discovery responses and documents should have been submitted. (Rule 3.1116(b) ["the exhibit must contain only the relevant pages of the transcript"]; Cal. Civ. Ctrm. Hbook. & Desktop Ref. § 17:19 (2014 ed.) ["The relevant portions of the document are usually excerpted in the moving or opposing papers and then attached as an exhibit."].)

[17] For example, plaintiffs submitted four documents (Sommer Exhibits 80, 10, 55, & 230) to argue that important Goldman policies were written down and an unwritten policy was unusual. Only two of these cited documents, Exhibits 80 and 55, were

26

mention at all was made of *hundreds* of the exhibits.  Inundating the trial court with this deluge of confidential materials was brute litigation overkill.  (See *Nazir v. United Airlines, Inc., supra,* 178 Cal.App.4th at pp. 289–290.)

While defendants' umbrage at plaintiffs' shock and awe document strategy was understandable, their motions to seal were, in turn, breathtaking in scope.

The courts need not, and should not, put up with this kind of abuse.  Every protective order should include language obligating the parties to be as sparing as possible in their use of protected materials.  Paragraph 14 of the protective order in this case specifically required the parties to "endeavor in good faith to restrict their . . . submissions to Confidential Information . . . reasonably necessary for the Court['s]" deliberations.  Courts should not hesitate to enforce such provisions through sanctions for egregious violations.  (Code Civ. Proc., § 128.5 [sanctions available for "bad-faith actions or tactics that are frivolous"]; see, e.g., *Wallis v. PHL Associates, Inc.* (2008) 168 Cal.App.4th 882, 900 [affirming sanctions for violation of protective order]; see also *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 532 [in making evidentiary objections to summary judgment materials, litigants should focus on objections "that really count" rather than swamping the trial court with hundreds of stock objections; "[o]therwise, they may face informal reprimands or formal sanctions for engaging in abusive practices"].)

Motions to strike can also be of utility.  The court in *Mercury* observed, for example, that because the exhibits to the complaint appeared "to have been entirely unnecessary to the pleading," the "sealing controversy could have been avoided by either a stipulation or an order amending the Complaint to strike the exhibits."  (*Mercury*, *supra*, 158 Cal.App.4th at p. 104, fn. 35.)  In fact, "the attached exhibits, as well as the quotes and references to them in the body of the Complaint, could have been stricken by the court either upon a motion by defendant or on its own motion.  [Citations.]"  (*Ibid.*;

actually policy documents.  Further, the proffered policy documents were wholly duplicative for the purpose for which they were submitted, particularly in light of a declaration plaintiffs submitted making the precise point that unwritten policies were unusual without referring to a single provision of even one of the purported written policies.

see also *Oiye*, *supra*, 211 Cal.App.4th at p. 1070 [courts "have inherent authority to strike scandalous and abusive statements in pleadings"].) Even where materials are not connected with a pleading (making a statutory motion to strike under Code of Civil Procedure sections 435 and 436 unavailable), "[t]he court's files and records are . . . subject to the court's control." (*Oiye,* at p. 1070; see also *Nazir, supra,* 178 Cal.App.4th at p. 290 [urging courts to use their inherent power to deal with unduly burdensome evidentiary materials and objections in connection with summary judgment motions]; *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95, 106 [trial courts "have the inherent power to strike proposed 'undisputed facts' that fail to comply with the statutory requirements and that are formulated so as to impede rather than aid an orderly determination whether the case presents triable material issues of fact"]; *Warner v. Warner* (1955) 135 Cal.App.2d 302, 303 [affirming striking and sealing of scurrilous affidavit].)

Thus, when a party submits a tsunami of discovery materials subject to a protective order, the trial court should welcome a well-honed motion to strike to winnow down the material to that which is *relevant* to the contentions advocated by the proffering party. The public's right of access to court records exists only as to such materials. It does not extend to irrelevant materials submitted to the court out of laziness in reviewing and editing evidentiary submissions, or worse, out of a desire to overwhelm and harass an opponent. (See discussion and cases cited, *supra,* at p. 25; *Roman Catholic Diocese of Lexington v. Noble* (Ky. 2002) 92 S.W.3d 724, 733 ["there is nothing to indicate that the public and the press historically have had access to sham, immaterial, impertinent, redundant or scandalous material that is without 'legal effect;'" in fact, "allowing access to such material serves a negative rather than a positive role"].)

Here, the trial court could have stricken *thousands* of pages of the confidential discovery materials plaintiffs submitted but never referenced in their opposing papers (or during the hearing on the motions). Had it done so, these irrelevant materials would have

effectively been removed from the court's file, eliminating the need to address any sealing issues as to these materials.[18] (See *Mercury*, *supra*, 158 Cal.App.4th at p. 104.)

Finally, on the other side of the equation, the trial courts can, and should, view overly inclusive sealing efforts with a jaundiced eye, and impose sanctions as appropriate. (See *Providian*, *supra*, 96 Cal.App.4th at p. 309 ["In light of defendants' history of defining confidential material as broadly as possible, it would not be improper for the trial court to view their latest effort with considerable skepticism and conclude that the scope of their proposed record sealing was neither 'narrowly tailored' nor the least restrictive means to protect any interest against disclosure"]; *Williams v. U.S. Bank Nat. Assn.* (E.D. Cal. 2013) 290 F.R.D. 600, 607 [threatening sanctions when "defendant made no effort at all to seal only those portions of the substantive exhibits that it actually wanted to protect as confidential"]; *Young v. Actions Semiconductor Co., Ltd., supra*, 2007 WL 2177028 at *6 ["Should either party again file a motion to seal which is inadequate or overbroad . . . the court may impose sanctions."].)

**D. *Evidentiary Requirements for Sealing***

A party seeking to have records sealed under the sealed records rules must make an evidentiary showing sufficient to support the findings required by those rules. (Rule 2.551(b)(1).) While "conclusory or otherwise unpersuasive" declarations that parrot statutory or rule-based requirements are generally inadequate (*Providian*, 96 Cal.App.4th at p. 301), the privacy interest in some documents, like medical records, is so apparent a declaration is not required (*Oiye*, *supra*, 211 Cal.App.4th at p. 1070).

*Providian* concluded the following declaration statements were not sufficient to support sealing: " 'Each of the documents at issue is considered proprietary and

---

[18] As a practical matter, such "removal" from the court's file may need to be effectuated by an order sealing the irrelevant, confidential material, for example, when a party anticipates challenging a court's irrelevancy determination on appeal. This removes the material from the public record, but physically leaves it in the court file for future appellate review. This is not a sealing order that implicates any right of access to court records (or, concomitantly, the sealed records rules), since there is no such right with respect to irrelevant discovery materials. (See cases cited, *supra,* at p. 25.)

confidential by Providian. Providian has developed the information contained in the documents at issue over a number of years—at a very significant cost and by taking very significant risks—to allow Providian to compete effectively in the market place for credit cards and related products.' " (*Providian*, 96 Cal.App.4th at p. 305.) " '[I]n my opinion, the documents . . . would have significant value to Providian competitors. . . . In general these documents represent information which is not known outside the business, which has value to both the business and competitors, which has required a substantial amount of effort and money to develop, and which could not otherwise be acquired or duplicated by competitors.' " (*Ibid.*) This showing, said the court, was "conclusionary and lacking in helpful specifics." (*Ibid.*)

*H.B. Fuller Co.* similarly criticized a declaration that stated: " 'I am careful to inform H.B. Fuller employees of this obligation [not to disclose the documents at issue] given that H.B. Fuller is a publicly traded company whose stock price and competitive position could be affected by the public disclosure of confidential business information.' " The court characterized this statement as "strikingly vague on the relevant points." (*H.B. Fuller Co., supra,* 151 Cal.App.4th at p. 896.) It was "notable not only for its abstract and generic character—it says nothing at all about the actual contents of the posted messages—but also its odd attenuation through hearsay. All it really purports to establish is what [the declarant] says to employees. Strikingly absent is a direct statement that such disclosures do, or even that they can, injure plaintiff." (*Ibid.*) "Nowhere does the declaration identify specific facts . . . that were confidential in any legally significant sense, or were not available to the public." (*Id.* at p. 895.) There was no "simpl[e] stat[ement of] what information . . . was damaging, and how or why." (*Id.* at p. 897.) "[W]ithout a clear enumeration of *specific facts* alleged to be worthy of the extraordinary measure of maintaining our records under seal, there is simply no basis to conclude that unsealing the records will actually infringe any interest of plaintiff's or inflict any harm on it." (*Id.* at p. 898.)

In contrast, *McGuan* concluded the following employee declaration sufficed: "[T]he records [to be sealed] discuss the details of defendants' 'quality system

30

procedures, complaint handling procedures, device tracking procedures, process validation procedures, and corrective action procedures.' . . . [T]hese records 'would have economic value to many medical device manufacturers, including Defendants' competitors, because they reveal the business methods and processes Defendants have developed to comply with the requirement of very technical FDA regulations.' . . . [T]he 'value and utility of this information is not completely dependent on the specific design of the device being manufactured, but could have application across a range of different Class III medical devices . . . [and . . . these records] are maintained as confidential and disseminated within Defendants' organization on a limited basis.' " (*McGuan, supra,* 182 Cal.App.4th at pp. 988–989.)

In *Universal City Studios,* a "fact-specific declaration" by a senior vice-president and controller of defendant would have carried the day, had the financial records at issue (revealing the proceeds in different markets for 25 different films) not already have been made public. "Mr. Martinez's declaration argues disclosure will cause 'competitive harm' to defendant in its negotiations with competitors and customers. Based upon Mr. Martinez's declaration and the nature of the financial data, we ordinarily would order sealing of such matters." (*Universal City Studios, supra,* 110 Cal.App.4th at p. 1286.)

In this case, because of plaintiffs' bloated evidentiary submission, defendants faced a difficult challenge in making the requisite showing for sealing and resorted to a combination of declarations and lengthy charts identifying every document they claimed should be sealed and the basis for doing so. This approach made sense given the magnitude of the discovery materials at issue. However, the declarations still had to be sufficiently detailed to demonstrate the materials were confidential and disclosure would be prejudicial, and the defendants' interest in maintaining confidentiality should override the public's constitutional right of access. (See *H.B. Fuller Co., supra,* 151 Cal.App.4th at pp. 895–897; *Providian*, 96 Cal.App.4th at p. 308.) As we discuss in the next section, addressing the specific discovery materials at issue, the defendants' declarations varied in their detail and were adequate in some regards, but not others. In addition, plaintiffs submitted counter-declarations, which the trial court was entitled to credit with respect to

many of the defendants' claims of proprietary confidentiality. (See *Clark v. Superior Court* (2011) 196 Cal.App.4th 37, 46 [under substantial evidence review, " ' "conflicts in the declarations must be resolved in favor of the prevailing party" ' "].)

**E.** ***The 2012 Sealing Order: Discovery Materials Submitted in Opposition to the Summary Judgment Motions***

**1.** ***Overview of the Parties' Evidentiary Showing***

Goldman submitted declarations by two individuals in support of its sealing motion—Joseph Floren, its litigation attorney, and Beverly Dunphy, a vice president in its Global Compliance Department. Floren's declaration included a chart, Exhibit A, of which the first 11 pages discussed the bases for sealing by category (e.g., "The Strategies of the Hedging Strategies Group Are Non-Public and Represent Trade Secrets of Goldman Sachs," "Client Information and Communications"). The remaining 143 pages, in chart form, identified each exhibit at issue as to Goldman and referenced the claimed bases for sealing discussed in the first 11 pages, as well as identified additional bases, such as irrelevancy. Dunphy averred the importance of safeguarding various confidences of the firm and its clients, and outlined procedures for keeping client information from leaving the firm and from spreading broadly within it. She also stated the materials "identified in Exhibit A to the Floren Declaration . . . include confidential client and firm proprietary information and related communications, which are confidential for the reasons detailed therein." She supplied a supplemental declaration discussing policies and procedures still in use at Goldman and reflected in plaintiffs' opposition exhibits.

Merrill similarly submitted declarations by two individuals—Flora Vigo, its litigation attorney, and Peter Melz, a Managing Director at the Merrill entities and President and Chief Operating Officer of Merrill Lynch Professional Clearing Corporation (Merrill Pro.). The pivotal component of Vigo's declaration, like that of Floren's declaration, was a chart, Exhibit A, setting forth, for each exhibit at issue, the claimed basis for sealing. Melz, in turn, stated Merrill considers its internal policies and procedures to be proprietary confidential information. "Safeguarding the confidentiality" of its client business plans and financial transactions "is critically important" and a

32

competitive advantage to the firm. The firm implements safeguards and ethical codes meant to keep this information from leaving Merrill and even from being widely disseminated within the firm. Melz also asserted the materials "[a]s described in detail in the chart attached as Exhibit A to the Vigo Declaration . . . reflect competitively sensitive information concerning [Merrill's] business, processes, procedures, systems, plans, strategies, clients, and transactions . . . not intended to be known to [Merrill's] competitors, is subject to reasonable efforts to maintain its confidentiality, and has actual or potential competitive value." In addition, Melz supplied a supplemental declaration clarifying the materials he reviewed, and a second supplemental declaration related to the confidentiality of Merrill's policies and procedures.

Plaintiffs maintain defendants' declarations are lacking in specifics and most of the information defendants want sealed is already in the public domain or lacks indicia of protectable information.[19] They also submitted an opposing declaration by Michael Manzino, a former employee of Morgan Stanley with over 20 years of Wall Street and securities lending experience. At Morgan Stanley, Manzino worked for almost 14 years at the securities lending desk, eventually becoming an executive director and the desk's second in command. His responsibilities included ensuring "an adequate supply of stock to support short selling by Morgan Stanley clients," and he developed "experience in all facets of the securities lending business." The security lending desks at Morgan Stanley, Merrill and Goldman were direct competitors. Manzino opined some of the information defendants sought to seal was stale and of no present economic value, including: information concerning opportunities for profitable shorting of stocks from 2005–2006; trading strategies employed by two former clients of defendants—Scott Arenstein and Steven Hazan—disclosed in public sanctions orders issued by the Securities and

---

[19] Plaintiffs also assert defendants' litigation counsel, Floren and Vigo, lack sufficient personal knowledge to provide testimony about the competitive value and confidential nature of their clients' documents. Any shortcoming in this regard, however, was corrected by the clients' own declarations adopting the attorneys' assertions as their own. (See *Snider v. Snider* (1962) 200 Cal.App.2d 741, 749 ["John Snider's affidavit, adopting the affidavit of Mathew, corroborates Mathew's statements."].)

Exchange Commission (SEC) and several exchanges; strategies related to naked short selling as part of "conversions" and strategies for "failing trades" that were no longer possible in light of 2008 changes to a federal securities regulation (called Regulation SHO); and compliance policies from 2005–2006 that were outdated because of significant changes in the regulatory environment. He also opined the identities of employees within securities lending desks at clearing firms such as defendants were well known and not confidential.[20] In addition, plaintiffs provided the trial court with a number of publicly available documents to show the extent to which information contained in their opposition papers was already in the public domain.

### 2. *The Discovery Materials at Issue*

Most of the discovery materials at issue were attached as exhibits to the declarations of Jonathan Sommer or Ellen Cirangle, two of plaintiffs' attorneys. For ease of reference, we refer to materials by declaration name and exhibit number. As a further aid to the trial court and parties, we identify in bold those exhibits, or portions thereof, we conclude should have been sealed.

### a. *Documents Containing Proprietary Business Information*

### i) *Goldman's Documents*

Goldman contends the trial court should have sealed numerous documents containing "details of its internal operations and business strategies." On appeal, Goldman has not discussed each of these documents and, instead, has discussed

---

[20] The trial court overruled defendants' objections to Manzino's declaration, stating they went to the weight of his statements, not their admissibility. Defendants do not take issue with the court's evidentiary ruling on appeal, but assert the court did not rely on the declaration. That is not what the court said. After overruling the objections the court stated even if it "were to sustain each objection, the Court's ruling on these sealing motions would be the same." So from the trial court's perspective the Manzino declaration was not outcome determinative, but this is not tantamount to a statement the court disregarded the evidence. Manzino's declaration was hardly a model declaration, however. While Manzino discussed many types of information, he did not specifically reference any of the exhibits at issue. Such linkage would have been extremely helpful to the trial court and this court, and should be done as a matter of practice in such declarations.

illustrative documents, which we presume are the most egregious examples of the trial court's assertedly erroneous failure to seal.

*Exhibit 2 to the Sommer Declaration*. This is a one-page, 2005 policy on "shortened settlement" that Floren's Exhibit A chart states is "an example of an internal . . . policy that should not be made public" because it would divulge "procedures regarding early settlement of equities transactions" not known to competitors. No specifics are provided as to the competitive value of this policy or the harm Goldman would suffer from its disclosure. Manzino's opposing declaration, in turn, states the 2005 policy "has no value" today, given the changes in the regulatory environment. Accordingly, the trial court's implicit finding that there is no "overriding interest that overcomes the right of public access" (rule 2.550(d)(1)) as to Exhibit 2 is supported by substantial evidence.[21] (See *H.B. Fuller*, *supra*, 151 Cal.App.4th at p. 896; *Providian*, *supra*, 96 Cal. App. 4th at p. 301, 305; see also *Hotels Nevada, LLC v. L.A. Pacific Center, Inc.* (2012) 203 Cal.App.4th 336, 348 [" 'we must " 'accept the trial court's resolution of disputed facts when supported by substantial evidence . . . and defer to its determination of the credibility of the witnesses and the weight of the evidence' " ' "].)

*Exhibit 55 to the Sommer Declaration*. This is a 20-plus-page, 2005 policy Floren's Exhibit A chart states "outlines supervisory procedures for Goldman Sachs's securities lending group, including provisions for supervising trading and complying with various laws and regulations, that were developed internally. . . at considerable effort and expense and are not known to competitors." While Goldman contends the policy is still in use today, it identifies no particular provisions of competitive value. Manzino's opposing declaration indicates the policy has no continued competitive value.

---

[21] *McGuan*, *supra*, 182 Cal.App.4th at pages 988–989, which Goldman cites in support of sealing, is distinguishable. In that case, the trial court sealed a company policy implementing complex FDA regulations on the basis of somewhat similar declarations, and the Court of Appeal affirmed, deferring to the trial court's factual findings since there was some evidence to support them. (*Id.* at p. 988.) Here, the trial court resolved the factual issues differently, on a different record, and our review is limited to determining whether the court's implicit findings are supported by substantial evidence. (See discussion and cases cited, *supra*, at 17–19.)

Accordingly, if the only issue as to Exhibit 55 was whether substantial evidence supported the denial of sealing, we would conclude sealing was properly denied.

However, in addition to contending it made a sufficient showing to seal, Goldman also asserts Exhibit 55 was irrelevant to the summary judgment proceedings.[22] Goldman is correct on this score. As best we can discern, plaintiffs submitted the exhibit to support their assertion certain alleged *un*written policies were unusual. However, plaintiffs' declarant made this point without citing a single provision of the written policy. Thus, the content of the 2005 policy—as opposed to the mere fact Goldman had a written policy—appears to have had no relevance whatsoever to the summary judgment motions. Indeed, on appeal, plaintiffs make no effort to explain Exhibit 55's relevance. Accordingly, this **irrelevant exhibit** could not, and did not, serve a basis of adjudication, and the sealed records rules do not apply. It therefore should have been s**truck from the record and either removed from the record or sealed for good cause**.[23]

*Exhibit 159 to the Sommer Declaration*. This is a November 2006 securities lending policy document, apparently an updated version of Exhibit 55. Unlike Exhibit 55, plaintiffs at least cited to the contents of Exhibit 159—but only to a section labeled subdivision "(d)," which occupied part of only two pages (GS0000144-45) of the nearly 30-page document. While there was evidence supporting the trial court's denial of sealing of these two pages (Manzino's opposing declaration), the remainder of the exhibit was irrelevant and part of the excessive documentation plaintiffs needlessly dumped on

---

[22] Goldman and Merrill both made extensive relevancy objections during the summary judgment proceedings, and they continued to complain about the deluge of irrelevant material during the sealing proceedings.

[23] Given that the sealed records rules do not apply to irrelevant discovery materials and no issue has been raised as to the propriety of the protective order or the confidential classification of the document, there is no need for remand and further consideration of sealing of any irrelevant materials by the trial court. (Compare *Mercury, supra,* 158 Cal.App.4th at pp. 106–107 [on remand trial court was to consider whether documents were properly designated confidential under the protective order].) This point pertains to all discovery materials we conclude were irrelevant and should have been struck or sealed for good cause.

36

the trial court.  Accordingly, these **irrelevant pages and portions of pages of Exhibit 159,** to which plaintiffs made no reference at all, **should have been struck and either removed from the record or sealed (by redaction if appropriate) for good cause.** (See *Apple*, *supra*, 727 F.3d at pp. 1226–1228 [only 12 out of 500 pages were submitted as basis for adjudication].)

*Exhibit 80 to the Sommer Declaration*.  This is another 2005 policy document, which Floren's Exhibit A chart describes as containing proprietary information about the use of conversion trades.  While the initial pages of Floren's Exhibit A generally suggest, and Dunphy's declarations obliquely suggest, aspects of Goldman's use of conversions remains a confidential business practice, neither declaration identifies these aspects or correlates them with any particular document, including Exhibit 80.  Manzino's opposing declaration, in turn, indicates otherwise, stating such trades "are a well-known trading strategy . . . to persons in securities lending" and are known to be used "as a source of supply" for "hard-to-borrow" securities.  In addition, the public SEC sanctions orders against Arenstein and Hazan disclose the use of conversions to create the appearance of stock supply to facilitate shorts.  There are also references to conversion trades in the public summary judgment reporter's transcript.  Accordingly, substantial evidence supports the trial court's refusal to seal the portion of this exhibit relevant to the summary judgment proceedings—a *single sentence* on one page (GS0012092) of the 17-page exhibit.[24]

---

[24]  The deposition testimony of David Santina, cited by Goldman, does not advance Goldman's case.  In fact, Santina testified he came across the concept of conversions "in the marketplace" and did not know if they gave Goldman any competitive advantage, viewing conversions as "just another source of supply." Santina's testimony does not prove the concept of conversions was unknown to others in the industry—especially given the Manzino declaration—and certainly does not show the concept has any present value.

We also reject Goldman's assertion the trial court was required to discount Manzino's view of conversion trades because he stated at deposition, in an out-of-context fashion, that he is not an "expert" on them.  Although not a self-proclaimed "expert" on the method's mechanics, he oversaw others making such trades, discussed those trades these individuals, and offered descriptions of the purpose and general process of the

The remainder of the exhibit, however, as Goldman points out, was wholly irrelevant to plaintiff's summary judgment opposition and, save for the first page, never should have been submitted to the court.  Accordingly, these **irrelevant pages and portions thereof of Exhibit 80 should have been struck and either removed from the record or sealed (by redaction if appropriate) for good cause.**  (See *Apple*, *supra*, 727 F.3d at pp. 1226–1228.)

*Exhibit 95 to the Sommer Declaration*.  This is a 2006, 52-page manual which Floren's Exhibit A chart describes as stating "the firm's policy prohibiting manipulative actions—essentially spell[ing] out how [Goldman] does all aspects of its business."  Floren additionally asserts public disclosure of the manual "would provide a roadmap to its competitors."  Again, the trial court did not err in determining these conclusory assertions did not suffice to support a sealing order.  (See *H.B. Fuller*, *supra*, 151 Cal.App.4th at pp. 895–897; *Providian*, *supra*, 96 Cal.App.4th at p. 305.)

However, apart from the single page with the *two paragraphs* to which they cited, plaintiffs have offered no defense for submitting the other 51 pages of this exhibit.  All of the exhibit, save for the two paragraphs plaintiffs referenced, were wholly irrelevant to their summary judgment opposition.  Accordingly, **these irrelevant pages and portions thereof of Exhibit 95 should have been struck and either removed from the record or sealed (by redaction if appropriate) for good cause.**  (See *Apple*, *supra*, 727 F.3d at pp. 1226–1228.)

*Exhibits 10, 20, 65, 134 and 156 to the Sommer Declaration*.  Goldman asserts these exhibits were largely irrelevant and thus not submitted as a basis for adjudication.  Goldman contends Exhibits 10 and 20, in part, concern securities other than Overstock; Exhibit 65, in part, addresses compliance matters unchallenged and not pertinent to plaintiffs' claims; Exhibit 134 discloses detailed securities performance data that, with the exception of one small grouping of data, has no relation to Overstock; and Exhibit

---

method, claiming knowledge of the overall idea describing the trades as used for "bringing new supply into the market for the purposes of increasing your short book." This deposition testimony does not undermine his declaration.

156 contains a list of fails to deliver having nothing to do with Overstock. In the trial court, plaintiffs made no response to these relevancy arguments, except as to Exhibit 10. On appeal, they have made no response at all to Goldman's assertion the lion's share of this discovery material was irrelevant.

It is apparent significant portions of Exhibits 20, 65, 134 and 156 were wholly irrelevant to plaintiffs' summary judgment opposition. Accordingly, **the irrelevant portions of Exhibits 20 (all but the top two e-mails in the chain), 65 (the unrelated and un-cited compliance items), 134 (non-Overstock related data, making up most of the exhibit), and 156 (the eight-page underlying e-mail with the list of "fails to deliver" not mentioning Overstock) should have been struck and either removed from the record or sealed (by redaction if appropriate) for good cause.** (*Apple*, *supra*, 727 F.3d at pp. 1226–1228.) As for the remaining portions of these exhibits and Exhibit 10, to which plaintiffs cited in their summary judgment opposition, the trial court's denial of sealing is supported by substantial evidence, including Manzino's opposing declaration.

*Exhibits 15–16, 18, 63, 108, 115, 118, 122, 124, and 131 to the Sommer Declaration.* As to these documents, the trial court again did not err in concluding the general assertions in the Floren and Dunphy declarations did not adequately specify the confidential business practices that purportedly needed to be protected or the harm that would result to Goldman from disclosure. (See *H.B. Fuller*, *supra*, 151 Cal.App.4th at pp. 895-897; *Providian*, *supra*, 96 Cal.App.4th at p. 305.) Further, Exhibits 15–16 and 18 are short e-mails that appear to be routine communications disclosing no obvious "trade secrets" or other crucial confidences of Goldman. To the extent the documents contain lists of "fails to deliver," such as Exhibits 108, 115, 118, 122, and 124, Manzino's opposing declaration stated, "[i]nformation concerning the supply of demand for, and fails-to-deliver in hard-to-borrow stocks in the 2005–2006 time period has no value whatsoever to a clearing firm today." Similarly, to the extent Exhibit 63, an e-mail, and other exhibits discussed various uses of "conversions," Manzino's opposition declaration stated, after the issuance of the public SEC sanctions orders, conversions

39

were "a well-known trading strategy . . . to persons in securities lending" and known to be used "as a source of supply" for "hard-to-borrow" securities.

However, as to Exhibits 108, 115, 118, 122, and 124, Goldman also claims large portions of the "fails to deliver" lists, specifically those portions with no relation to Overstock, were irrelevant. Plaintiffs made no response to Goldman's irrelevancy claims in the trial court. Nor have they done so on appeal—understandably, since out of these exhibits (which, alone, totaled 218 pages) plaintiffs cited to a pittance, highlighting only a line or two in spreadsheets spanning many dozens of pages.[25] Accordingly, **all of the portions of Exhibits 108, 115, 118, 122, and 124 Goldman identified as irrelevant should have been struck and either removed from the record or sealed (by redaction if appropriate) for good cause.** (See *Apple*, *supra*, 727 F.3d at pp. 1226–1228.)

As for Exhibit 63, Goldman points out it contains figures in four lines, just above the signature line, that reflect internal business metrics (such as profitability), of which plaintiffs made no mention. Accordingly, this **confidential economic information in Exhibit 63 was also irrelevant and should have been struck and either removed from the record or sealed (by redaction) for good cause.**

Exhibit 131 is another multi-page document—a midyear review with financial data and a strategic outlook—that plaintiffs cited for only a single data point, a dollar amount associated with a certain type of conversion transaction by Goldman in Overstock. As to the cited information pertaining to Overstock, Goldman failed to justify sealing—Floren's declaration that the document contains "internal financial information regarding . . . operations . . . which is not available publicly" simply does not address the particular figure or any particular harm from disclosure. (See *H.B. Fuller*, *supra*, 151 Cal.App.4th at pp. 895–897; *Providian*, *supra*, 96 Cal. App. 4th at p. 305.) However, **the remainder of Exhibit 131 was irrelevant to plaintiffs' summary**

---

[25] This is another example of plaintiffs' oppressive summary judgment opposition. We cannot fathom why, after highlighting a mere line or two of these documents (and countless others, such as Sommer Exhibits 55 and 95 (policy manuals), and 207–222 (deposition transcripts)) as relevant, plaintiffs burdened the court with hundreds of additional pages that were wholly irrelevant.

**judgment opposition and should have been struck and either removed from the record or sealed (by redaction if appropriate) for good cause.** (*Apple*, *supra*, 727 F.3d at pp. 1226–1228.)

*Exhibits 19, 59, 53 to the Sommer Declaration.* In its opening brief, Goldman referred to several "other" examples of documents containing confidential, internal material it contends should have been sealed. However, it provided only record cites without mentioning exhibit numbers, forcing this court to go through the record simply to identify the document being discussed and making it extremely difficult to locate and correlate arguments being made about any given document. It turns out the record pages cited refer to Exhibits 2, 19, 53, 59, 63, 80, 95, 159, and 207 to the Sommer declaration. Exhibits 2, 63, 80, 95, 159, and 207, however, are addressed elsewhere in Goldman's briefing and in this opinion. As for Exhibit 53, the trial court sealed the last two pages, thus protecting the confidential client list about which Goldman was concerned. No argument or analysis has been provided as to Exhibits 19 and 59, and we refuse to examine them without any assistance by the party advocating error. (*Advanced Choices, Inc. v. Department of Health Services* (2010) 182 Cal.App.4th 1661, 1671 [" ' "[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived." ' "]; rule 8.204(a)(1)(B) [a brief must "support each point by argument"].) In any case, we note that while Goldman describes Exhibit 59 as a "complete copy" of an internal policy or procedure manual, it is not—rather, it is a short, three-page e-mail chain. To the extent it discusses how Goldman operates, it simply discusses compliance with public regulations and bears no indicia of confidentiality.

*Remaining Exhibits Assertedly Containing Goldman's Propriety Information.* As for the rest of the exhibits Goldman claims contain proprietary business information and should have been sealed, it has provided no specific discussion but simply a footnote

string cite of the exhibits.[26] Ordinarily, we would deem any issues waived as to these exhibits for lack of any analysis. However, Goldman has demonstrated sufficient error in connection with the exhibits it has specifically addressed to allow an inference the trial court employed an erroneous view of the scope of the sealed records rules. Specifically, it appears the court concluded that if any portion of an exhibit was relevant and an insufficient showing was made to seal that portion, then sealing would be denied as to the entire exhibit, regardless of whether the rest of the exhibit was relevant.

The sealed records rules do not take a wholesale, document-only approach. (See rule 2.551(h)(5) [order unsealing record must specify whether record is unsealed in whole *or in part*].) Understandably, since that would facilitate the kind of blunderbuss approach plaintiffs took here and largely vitiate the protections afforded entire documents by a protective order. Moreover, the constitutional right of access to court records and, in turn, the sealed records rules, apply only to discovery materials that are *relevant*, and to the extent plaintiffs burdened the trial court with thousands of pages of confidential materials that were irrelevant, the rules did not apply, and those irrelevant pages and portions thereof should have been struck and sealed for good cause. We therefore **reverse the sealing order as to these exhibits and remand for the limited purpose** of identifying any part of them as to which evidentiary objections were sustained or which were irrelevant to plaintiffs' summary judgment opposition (e.g., not cited by plaintiffs). Any such parts of these exhibits were not submitted as a basis for adjudication, and are to be struck and either removed from the record or sealed (by redaction if appropriate) for good cause.

The trial court, however, is not to be saddled with this task in the first instance. Rather, on remand, Goldman and plaintiffs are to proceed as follows: (a) review each of

---

[26] The footnote lists: Sommer Declaration exhibits 2, 4, 7, 10, 15-16, 18-21, 33, 35-36, 47, 51, 55, 59, 63, 65, 69-70, 74-76, 80, 86-87, 89, 95, 104-106, 108, 111-13, 115-18, 122, 124, 131, 134-40, 149-50, 156, 159, 166-67, 177, 179, 181, 201, 205-07, 209-14, 216-22, 225-27, 229, 231-38, 240; Cirangle Declaration exhibits 188, 202-03; Allaire Declaration exhibit E; Banks Declaration in Support of Defendants' Reply and exhibits 1, 5, 6, 9-10, 12, 16, 19-20, 25, and 29.

the string cited exhibits in light of our discussion of exhibits containing proprietary information; (b) reach agreement to the extent possible as to those exhibits (or *pages* thereof) that were *irrelevant* to plaintiffs' summary judgment opposition (e.g., not cited by plaintiffs, or having no bearing on the point in connection with which the exhibits were cited by plaintiffs, or as to which an objection was sustained) and which therefore should have been struck and either removed from the record or sealed for good cause, and (c) return to the trial court on a further motion to seal that is focused and limited accordingly.

### ii) *Merrill's Documents*

Merrill contends 141 documents should have been sealed because they contain proprietary business information. Like Goldman, Merrill has specifically identified and addressed only some of these documents. We therefore focus on them, again assuming they are the most egregious examples of the trial court's allegedly erroneous failure to seal.

The documents fall into two categories—those concerning a Merrill process called "do not flip" (Cirangle Declaration, Exhibits 39 and 115) and those containing excerpts of regulatory compliance manuals (Cirangle Declaration, Exhibits 21, 23, 147 and 157).

*Exhibits 39 and 115 to the Cirangle Declaration.* The "do not flip" process is no secret. It was discussed publicly by Merrill's counsel during the summary judgment hearing on January 5, 2012, and described as a means for intentionally failing trades, including trades by "market makers"[27] in negative rate securities such as Overstock. Further, according to plaintiffs' expert Manzino, "[b]ecause of the large-scale changes in Regulation SHO in 2008, any past practices of Goldman Sachs and Merrill Lynch related to failing trades and then working to avoid the requirement that fails-to-deliver be closed

---

[27] Federal statute defines "market maker" as "any specialist permitted to act as a dealer, any dealer acting in the capacity of block positioner, and any dealer who, with respect to a security, holds himself out (by entering quotations in an inter-dealer communications system or otherwise) as being willing to buy and sell such security for his own account on a regular or continuous basis." (15 U.S.C. § 78c(a)(38); see generally *In re Xcelera.com Securities Litigation* (1st Cir. 2005) 430 F.3d 503, 515.)

out within thirteen days have no economic value today." While Melz's supplemental declarations assert some aspects of the process remain secret and valuable Exhibits 39, a two-page email, and 115, a two-page form, reveal little more than what was disclosed in open court. Additionally, Melz articulates no specific basis for sealing any alleged confidential information not disclosed at summary judgment. (See *H.B. Fuller, supra,* 151 Cal.App.4th at p. 898 [emphasizing need for "specific facts" to justify sealing].) The trial court was not required, in any event, to credit Melz, over Manzino, as to the continuing value of aspects of the "do not flip" process. In sum, given the public in-court statements, the lack of specificity of the Merrill declarations, and Manzino's opposing declaration, the trial court's denial of sealing as to Exhibit Nos. 39 and 115 is supported by substantial evidence. (See *H.B. Fuller*, at pp. 895–897; *Providian*, *supra*, 96 Cal.App.4th at p. 305.)

*Exhibits 147 and 157 to the Cirangle Declaration.* Exhibit 147 outlines Regulation SHO procedures Merrill adopted in 2005 and 2006. Exhibit 157 is a heavily redacted (even under seal) July 2006 "trading desk compliance manual." Merrill's declarations again fail to explain with specificity the true competitive value in, or the expected harm from the release of, the policies or procedures disclosed in these dated materials. Vigo's declaration states only that the documents are "competitively sensitive" or "internal business and strategy" because the documents discuss "Reg SHO-related compliance policies and procedures" and Merrill's undefined "proprietary operational systems." Melz's declaration does specifically mention Exhibits 147 and 157, but only states these "are excerpts of Merrill Lynch's compliance manuals that contain detailed descriptions of Merrill Lynch's procedures and operations and reflect Merrill Lynch's processes, procedures, systems, plans, and strategies for implementing and complying with particular regulations." Nothing specific is said about the harm from disclosure of any particular information. Manzino, in turn, declared that primarily because of the adoption of Regulation SHO and subsequent changes to it, "[c]ompliance policies for securities lending group from the 2005–2006 time period also have no value to a clearing firm today." Given the absence of specifics in the Merrill declarations and Manzino's

44

opposing declaration, substantial evidence supports the trial court's denial of sealing as to Exhibits Nos. 147 and 157. (See *H.B. Fuller*, *supra*, 151 Cal.App.4th at pp. 895–897; *Providian*, *supra*, 96 Cal.App.4th at p. 305.)

*Exhibits 21 and 23 to the Cirangle Declaration.* We reach a different conclusion, however, as to these exhibits to which the trial court sustained evidentiary objections on hearsay grounds. As a result, these documents could not, and did not, serve as a basis for adjudication, and the sealed records rules do not apply. The documents thus remain subject to the provisions of the protective order, and **excluded Exhibits 21 and 23 should have been sealed for good cause**. (Cf. *Mercury, supra*, 158 Cal.App.4th at pp. 107–108.)

*Remaining Exhibits Assertedly Containing Merrill's Propriety Information.* As for the rest of the 141 exhibits Merrill claims contain proprietary business information and should have been sealed, it, like Goldman, provides no specific discussion and a footnote string cite to the exhibits at issue.[28] Again, while we ordinarily would not consider claims of error as to these documents given the lack of any analysis by Merrill, as we have discussed above in connection with the exhibits Goldman string cited, there has been a sufficient showing the trial court employed an inaccurate analysis to warrant a remand as to these exhibits. We therefore **reverse the sealing order as to these exhibits and remand for the limited purpose** of identifying any part of these exhibits as to which evidentiary objections were sustained or which were irrelevant to plaintiffs' summary judgment opposition (e.g., not cited by plaintiffs). Any such parts of these exhibits, by definition, were not submitted as a basis for adjudication, and are to be struck or sealed (by redaction if appropriate) for good cause.

---

[28] This footnote list is as follows: "Cirangle exhibits 5-16, 18-21, 23-30, 33, 34, 36-41, 43-45, 47, 49-55, 57-60, 65, 69-72, 74, 76, 78-80, 84, 86-94, 99, 100, 110-15, 117-19, 129, 134, 136, 138-41, 143, 147, 151, 156-59, 161, 169, 171-74, 175-84, 187, 201, 202, and 204-213 (see 13-32 CA CC 7375); Sommer exhibit 223 (43 CA C010427-36); Banks exhibits 2 11, 15, 22-24, and 26-28 (see 60-61 CA C014694-872); and Power exhibits 1-3 (60 CA C014570-616)."

Again, the trial court is not to be burdened with this task in the first instance. Rather, on remand, Merrill and plaintiffs are to proceed as follows: (a) review each of the string cited exhibits in light of our discussion above of exhibits containing proprietary information; (b) reach agreement to the extent possible as to those exhibits (or *pages* thereof) that were *irrelevant* to plaintiffs' summary judgment opposition (e.g., not cited by plaintiffs, or having no bearing on the point in connection with which the exhibits were cited by plaintiffs, or as to which an objection was sustained) and which therefore should have been struck and either removed from the record or sealed for good cause, and (c) return to the trial court on a further motion to seal that is focused and limited accordingly.

### b. *Materials Designated Confidential by Third Parties*

Goldman and Merrill also complain the trial court failed to seal confidential discovery materials produced by third parties. Goldman identifies six such exhibits, Merrill, 16 exhibits. If a party wishes to file material a third party has produced during discovery and which the third party has designated as confidential under a protective order, the party submitting the confidential material must "[g]ive written notice to the party that produced the records that the records and the other documents lodged . . . will be placed in the public court file unless that party files a timely motion or application to seal the records under this rule." (Rule 2.551(b)(3)(A)(iii).)

*Exhibits 62 and 63 to the Cirangle Declaration.* These exhibits are instant message communications produced by another broker. Plaintiffs concede they gave no notice to the broker who produced them and on appeal request that the exhibits be sealed. This is not tantamount to a stipulation to seal prohibited under the sealed records rules. Rather, the rules impose, for due process purposes, a procedural threshold that must be crossed before confidential materials produced by a third party can be made public— timely and adequate notice. Given plaintiffs' admission they failed to give the required notice, **Exhibits 62 and 63 remain subject to the protective order and must either be removed from the record or sealed for good cause**.

46

*Exhibits 40 and 69 of the Cirangle Declaration and Exhibits 48, 76 and 228 of the Sommer Declaration.* Plaintiffs also concede they gave no notice to the NYSE or FINRA as to these documents, but contend no notice was necessary because the documents, while submitted to and in the possession of these regulatory bodies, were generated by Goldman or Merrill. Since neither Goldman nor Merrill suggest the NYSE or FINRA could have advanced any additional arguments in support of sealing defendants' own materials not already made by defendants, we conclude plaintiffs' failure to give notice is a moot point. We discuss defendants' other arguments in connection with these exhibits elsewhere in this opinion.

*Exhibit 169A to the Cirangle Declaration.* Plaintiffs also failed to notify Deutsche Bank when they submitted the bank's confidential material (the deposition of a Deutsche Bank employee) to the court. They eventually did give some form of notice just before the hearing on the sealing motions, but this notice is not in the record on appeal. We have only Deutsche Bank's responsive letter, which it filed one day before the hearing, stating it had not received a copy of plaintiffs' summary judgment submissions and did not consent to the unsealing of its material. While Deutsche Bank might well be faulted for taking no further steps in the trial court to protect its information and for not participating in this appeal, the sealed records rules provide important protections to third parties, and on this record, we cannot say Deutsche Bank was afforded proper notice under them.

Nonetheless, we have reviewed the *three lines* of deposition testimony plaintiffs cited (out of the 14 pages of deposition transcript they submitted). These three lines do not even relate to Deutsche Bank. Thus, there is no conceivable confidentiality interest in that material, and no purpose would be served by reversing and remanding for adequate notice. The rest of the exhibit, however, was irrelevant to the summary judgment proceedings—another example of plaintiff's abusive approach in their opposition papers. This **irrelevant material should have been struck and either removed from the record or sealed (by redaction if appropriate) for good cause.** (See *Apple*, *supra*, 727 F.3d at pp. 1226–1228.)

47

*Exhibits 5, 7, 36, 45, 104, 110, 156, 159, 174A and 201 to the Cirangle Declaration.* In its opening brief, Merrill asserted these exhibits are also third party confidential documents as to which no notice was given, but made no specific arguments as to the documents.[29] In their respondents' brief, plaintiffs claimed the documents were not third-party documents, noting many have Bates numbers identifying the documents as originating with Merrill. Merrill made no response in its reply brief. Given the lack of specific argument and its failure to address the presence of Bates numbers, we conclude Merrill has not demonstrated any error in the trial court's refusal to seal these documents.

### c. *Documents Related to Non-Public Regulatory Investigations*

Merrill contends 41 exhibits should have been sealed because they "reference non-public regulatory matters." These are documents Merrill produced, not documents produced by the SEC. Merrill fails to describe or differentiate any of the 41 documents, illuminate their origin, or explain the harm from their disclosure. (See *H.B. Fuller*, *supra*, 151 Cal.App.4th at pp. 895–897; *Providian*, *supra*, 96 Cal.App.4th at p. 305.) Furthermore, the regulation on which Merrill relies—governing non-public SEC investigations—authorizes *that agency* to "respectfully decline" to produce materials gathered during certain investigations. (17 C.F.R. § 240.0-4.) Merrill has not shown that this SEC regulation even applies to the 41 documents Merrill *itself* produced. (See *Westinghouse Elec. Corp. v. Republic of Philippines* (3d Cir. 1991) 951 F.2d 1414, 1427 [discussing regulation]; see also *In re Home Unity Shareholder Litigation* (E.D. Pa., May 19, 1988, No. Civ.A. 87-5609) 1988 WL 52014 ["Plaintiffs are seeking documents in the possession of Home Unity. They are not seeking documents from the SEC of which Home Unity is unaware."].) Accordingly, we conclude Merrill has not demonstrated any error in the trial court's refusal to seal these documents.

### d. *Documents Containing Client Financial Information*

---

[29] It made the same argument as to Cirangle Exhibit 23, but as we have already observed, *supra,* at page 45, the trial court sustained a hearsay objection to it, and this non-evidentiary document should have been sealed for good cause.

Goldman and Merrill contend numerous exhibits should have been sealed because they contain confidential client financial information, such as trades, positions, and account data.

The right to privacy under article I, section 1 of the California Constitution " extends to one's confidential financial affairs . . . . ." (*Valley Bank, supra,* 15 Cal.3d at p. 657.) This right embraces confidential financial information in "whatever form it takes, whether that form be tax returns, checks, statements, or other account information." (*Fortunato v. Superior Court* (2003) 114 Cal.App.4th 475, 481 (*Fortunato*).) Thus, in *Valley Bank*, the Supreme Court held that before a bank discloses customer financial information in civil *discovery* proceedings, it "must take reasonable steps to notify its customer of the pendency and nature of the proceedings and to afford the customer a fair opportunity to assert his interests by objecting to disclosure, by seeking an appropriate protective order, or by instituting other legal proceedings to limit the scope or nature of the matters sought to be discovered." (*Valley Bank, supra,* 15 Cal.3d at p. 658; see also *Fortunato, supra,* 114 Cal.App.4th at pp. 480–481 [protective order should have issued as to tax returns submitted to bank as part of loan application].) A financial institution, "as custodian of . . . relevant documents," has "standing to assert the privacy interests of its customers in the identifying information they" provide. (*Pioneer Electronics (USA), Inc. v. Superior Court* (2007) 40 Cal.4th 360, 368; see also Gov. Code, §§ 7461, subd. (b), 7465, subd. (a) [regulating state-run investigations of customers of banks, savings associations, trust companies, industrial loan companies, and credit unions, and recognizing the "confidential relationships between [such] financial institutions and their customers are built on trust and must be preserved and protected"].)

*Valley Bank* made only passing reference to the *sealing* of financial information as a tool to protect privacy interests, and the case pre-dates *NBC Subsidiary* and the sealed records rules. Thus, the question in the context of sealing is whether the state recognized privacy interest in financial information overrides the federal constitutional right of access to court records. This is necessarily a balancing inquiry, dependent on the facts

49

and circumstances of the particular case.  (See *NBC Subsidiary*, *supra*, 20 Cal.4th at pp. 1201, 1206; rule 2.550(d).)

Two Court of Appeal opinions have considered the sealing of financial information under the *NBC Subsidiary* rubric.  In *Burkle, supra,* 135 Cal.App.4th at page 1045, the court considered the validity of Family Code section 2024.6, which required, at the request of either party, the sealing of any pleading in a divorce case listing information about the financial assets and liabilities of the parties and providing the location or identifying information about such assets and liabilities.  (*Burkle,* at pp. 1052–1070.)  Focusing on the Legislature's stated finding the statute was necessary to protect parties from identify theft and other economic crimes, the court concluded the statute was not narrowly tailored to achieve that compelling objective.  (*Id.* at pp. 1069–1070.)  The court drew a distinction, for example, between highly sensitive identifying information, such as account and social security numbers or asset locations, that can facilitate criminal activity, and more general information, such as the mere existence and stated value of an asset or liability, which does not create such a risk but which was nevertheless subject to mandatory sealing under the statute.  (*Id.* at pp. 1065–1066.)  As to the latter sort of information, the court concluded mandatory sealing at the request of a party was at odds with the statute's stated purpose and with the analysis required to support sealing under *NBC Subsidiary,* and so invalidated the statute.  (*Id.* at pp. 1066, 1070.)

In *Universal City Studios*, *supra*, 110 Cal.App.4th at page 1275, the appellate court addressed the petitioner's motion to seal two groups of documents in the appellate court record, a settlement agreement (*id.* at p. 1283) and papers related to a motion to dismiss (*id.* at p. 1284).  As to the settlement agreement, the financial information in that document had been redacted, and the defendant failed to present any evidence it would be damaged by the disclosure of the document in that form.  (*Id.* at pp. 1283–1284.)  Turning to the motion to dismiss papers, the defendant similarly failed to justify sealing the lion's share of them.  (*Id.* at pp. 1284–1285.)  As to "20 pages of financial and accounting data" within those papers, however, the court concluded petitioner had made a sufficient showing.  (*Id.* at pp. 1285–1286.)  These pages contained the "proceeds in

different markets for 25 different films" and the defendant submitted a "fact-specific" declaration by its controller and senior vice-president that disclosure of this data would cause "competitive harm" to the defendant in "negotiations with competitors and customers." (*Ibid.*) Even though the court "ordinarily would order sealing" given the facts, it ultimately denied sealing because the financial data had already been loosed into the public domain in another case. (*Id.* at p. 1286.)

Here, defendants made a showing of injury from the disclosure of client financial information at least as strong as that made in *Universal City.* Melz, a Managing Director of Merrill entities and President and COO of Merrill Pro, stated "safeguarding the confidentiality of client information is critically important to Merrill Lynch, and Merrill Lynch has several policies in place to protect" information such as "clients' identities, trading activity, trading or business strategies or plans, account information, policies, procedures, practices, . . . and their confidential communications." Merrill considers client information to be "proprietary and confidential." This policy is expressed in the firm's written Code of Ethics, confidentiality training is required for all employees, and Merrill has procedures—such as "systematic information barriers"—so information is shared only on a "need to know" basis. Dunphy, a Vice President of Goldman's Global Compliance Department, similarly stated Goldman derives a competitive advantage and reputational benefit from its "strong commitment to confidentiality" with respect to client identities and trade data. "Protecting the confidentiality of client information," stated Dunphy, "is a matter of fundamental importance" and also a matter of SEC regulations. Numerous written policy documents implement protection of client data and breaches would be "unthinkable." We also observe that, unlike *Universal City* and *Burkle*, the confidential financial information at issue here is that of *third parties*.

Thus, the confidential financial information in question in this case implicates significant privacy interests. Plaintiffs, in fact, acknowledged in the protective order that client transaction data "may be protected by rights of privacy or other confidentiality rights" and agreed not to contact any third party disclosed in produced documents without consent. The parties thus agreed to forego redactions "to avoid undue delay,

51

burden, and expense in document production." Relying on this stipulation, defendants produced "millions of pages" "in unredacted form."

During the sealing proceedings, plaintiffs argued clients who had been sanctioned for their trading behavior, including Arenstein and Hazan, had no remaining privacy interest. They conceded, however, "to the extent any remaining customer information exists in the documents Defendants seek to seal, any privacy concerns could easily be addressed through simple redaction of any such information." Thus, "if an email string . . . makes mention of unrelated client confidential information, that portion of the email could be redacted." On appeal, plaintiffs reiterate redaction would have been the "simple solution" and do not suggest anything would be lost in terms of the public's understanding of the summary judgment proceedings if information linking individuals to their private financial data (other than that already publicly known) were redacted. Nevertheless, they claim defendants failed to preserve the right to redact by seeking the sealing of entire exhibits. Not so. Goldman and Merrill made sufficient offers to redact the documents and, at the hearing on their sealing motions, made clear an "all-or-nothing" approach "is absolutely not our position." Thus, this is not a case like *Providian*, in which the party seeking to seal documents "actually opposed redacting when the subject was raised," "spurned" a more nuanced approach, and led the trial court to ignore the issue of redactions—conduct which lead the appellate court to conclude the option to redact had been waived. (*Providian*, *supra*, 96 Cal.App.4th at p. 309.) We also question whether waiver of redaction predicated solely on a financial institution's conduct could ever be appropriate where *third party* confidential financial information is at issue.

With this background, we turn to the exhibits assertedly containing confidential client financial information, and for ease of discussion, have grouped like exhibits. We conclude the trial court should have ordered much of this confidential third party financial information sealed—largely because it was irrelevant to plaintiffs' summary judgment opposition.

### i) *Documents Not Cited and Lengthy Documents of Which Only Scant Portions Were Cited*

*Exhibits 48 and 139 to the Sommer Declaration.*  These exhibits consist, respectively, of a client account statement and an e-mail with an attachment.  In the trial court, defendants objected to these exhibits as uncited and irrelevant.  Further, Goldman, in Floren's Exhibit A, asserted Exhibit 48 had no relation to Overstock.  Plaintiffs, as best we can glean from the record, made no response to these relevance issues in the trial court, and they have made no response on appeal.  Moreover, our review of the record confirms plaintiffs made no specific mention of either exhibit in their summary judgment opposition.  Accordingly, these exhibits were **irrelevant and should have been struck and either removed from the record or sealed for good cause.**  (See *Apple*, *supra*, 727 F.3d at pp. 1226–1228.)

*Exhibits 25 and 86 to the Cirangle Declaration.*  These exhibits each consist of a cover page followed by a lengthy report containing information about the trades of one or more clients.  In their summary judgment opposition, plaintiffs cited and quoted only from the cover pages, and did not cite to or make any mention of the contents of the reports.  The trial court correctly refused to order the cover pages sealed since they reveal no client confidential financial information.  However, the rest of pages were **irrelevant and should have been struck and either removed from the record or sealed for good cause.**  (See *Apple*, *supra*, 727 F.3d at pp. 1226–1228.)

### ii) *Document With No Client-Identifying Information*

*Exhibit 164 to the Cirangle Declaration.*  This exhibit is a 17-page spreadsheet reporting "trade information" pertaining to Overstock shares.  Merrill contends it contains "client account numbers and short stock positions."  However, the spreadsheet was discussed at the summary judgment hearing, without objection, and it is clear it does not represent the trades of any one client.  Rather, it references a particular *Merrill* account that sweeps in, *but does not identify,* multiple Merrill clients.  Accordingly, the exhibit does not contain client identifiable confidential financial information, and the trial court correctly refused to order it sealed.

### iii) *Documents Concerning Publicly Known Clients*

As we have observed, Scott Arenstein and Steven Hazan have been publicly identified in connection with defendants, and their trading methods—naked short selling, flex options, conversions—were discussed numerous times during the leave to amend and summary judgment hearings. Even the parties' public, redacted trial court briefing connects these clients and their trading activities to defendants. Additionally, the SEC and other regulatory entities discussed Arenstein's and Hazan's trading methods in detail in lengthy orders sanctioning these clients for these trading practices. Manzino thus stated in his opposing declaration "there is no economic value to Merrill Lynch or Goldman Sachs in any emails and other communications involving [these clients] that I reviewed."

*Exhibits 4 and 18 to the Sommer Declaration, and Exhibit 4 to the Cirangle Declaration.* Exhibit 4 to the Sommer Declaration is a one-page Goldman email chain concerning a supposed "market maker" client of both defendants, Arenstein, and a trading strategy already publicly associated with him. Exhibit 18 is a two-page Goldman email chain, also discussing Arenstein and his publicly known trading strategies. Exhibit 4 to the Cirangle Declaration is a one-page Merrill email discussing Arenstein and his interest in opening an account with Merrill. In light of the public disclosures concerning Arenstein and the Manzino declaration, the trial court's refusal to seal these exhibits is amply supported. Indeed, defendants' continued requests to seal them obdurately ignores the realities of the state of public record.

*Exhibits 8, 15 and 16 to the Sommer Declaration and Exhibit 88 to the Cirangle Declaration.* Exhibits 8, 15 and 16 also refer to Arenstein and Hazan and the rudiments of their now-publicly known trading strategies. For the reasons we have just discussed, the trial court's refusal to seal these documents is supported by substantial evidence.

*Exhibit 46 to the Sommer Declaration.* This exhibit is an e-mail string that references Arenstein's Merrill Lynch account numbers, the size of a wire sent into that account, and his net liquidity. Although much information about Arenstein is publicly known, this financial information is not. Nor did plaintiffs cite to it. Instead, they cited

to other parts of the email.  Accordingly, this financial information was **irrelevant and should have been ordered struck and either removed from the record or sealed (by redaction if appropriate) for good cause**.  (See *Apple*, *supra*, 727 F.3d at pp. 1226–1228.)

This exhibit additionally discloses Arenstein's overall short position and leverage in January 2005, which plaintiffs did mention in their opposition papers.  They claim these numbers relate to whether defendants were merely following customer instructions on certain Overstock related trades, or acting willfully.  The trade numbers, themselves, have no demonstrable relation to Overstock trades, particularly, or to the issue of "instruction following," and were therefore **irrelevant and should have been struck and either removed from the record or sealed (by redaction if appropriate) for good cause**.  (See *Apple*, *supra*, 727 F.3d at pp. 1226–1228.)  The leverage ratio, however, does appear to have some colorable connection to defendants' knowledge.  That 2005 figure also reflects the already-known trading strategy of Arenstein, and the trial court properly refused to order this information sealed.

*Exhibit 8 to the Cirangle Declaration.*  This is a two-part document.  Part two is Merrill's new client form for Arenstein, which divulges his opening balance, estimated annual revenue, stock and option volumes, total combined equity, and affiliations with other financial firms.  Again, while considerable information about Arenstein is publicly known, the items just listed are not.  Nor did this information have any relevance to the summary judgment proceedings.  Accordingly, this **irrelevant information should have been struck and either removed from the record or sealed (by redaction if appropriate) for good cause.**  On the other hand, Arenstein's identity, trading strategies and use of certain computer software were discussed at the summary judgment hearing, where this document was explicitly referenced.  Accordingly, the trial court correctly refused to order this information sealed.  As for the first part of  the exhibit—emails that identify numerous new clients and accounts—plaintiffs made no mention of it at all.  Accordingly, this part of the exhibit was also **irrelevant and should have been struck**

**and either removed from the record or sealed (by redaction if appropriate) for good cause**. (See *Apple*, *supra*, 727 F.3d at pp. 1226–1228.)

*Exhibit 88 to the Cirangle Declaration.* This exhibit is a transcript of a telephone conversation between Arenstein and Merrill, wherein a Merrill employee tells Arenstein he needs to take action to meet Regulation SHO requirements. On the whole, the transcript simply shows Arenstein's publicly known trading strategy in action, and the trial court properly refused to seal this information.

*Exhibit 161 to the Cirangle Declaration.* This exhibit is a lengthy spreadsheet showing trades in Overstock by Arenstein and Hazan. At the summary judgment hearing, the salient features of the spreadsheet with respect to Hazan were discussed, namely that he had a short position of 2,500 shares on August 2, 2005, 415,000 shares on August 15, 2005, 515,000 shares a day later, and stayed over six figures in shares for a year, occasionally topping a million shares. Accordingly, this can no longer be considered confidential financial information, and the trial court correctly refused to order it sealed. Given that such information as to Hazan was not treated as confidential, we see no reason why the court should have treated the same information as to Arenstein any differently, particularly given all the other publicly disclosed information about Arenstein's trading. Accordingly, the trial court also correctly refused to order this information sealed.

*Exhibits 59, 105, 106, 137 and 233-236 to the Sommer Declaration.* These exhibits all contain information about short sales and related "buy ins" or settlement obligations of numerous clients, including Arenstein and Hazan. The documents mention stock names, quantities, and prices. Some, such as Exhibits 105 and 106, concern trades in Overstock. Many of the documents are voluminous and recount many trades. Although the SEC sanctions orders reveal the overall scope of some clients' short selling practices by noting total profits gained (in the millions of dollars) and explaining the per-share profit the clients derived (in one example, $1.40 per share), the orders do not reveal the stocks in which the clients traded or the amount of trading in any one stock. Outside of the sanctions orders, only one security, Overststock stock, has been publicly linked to

56

just two clients, Arenstein and Hazan. (Gullo, *Goldman, Merrill E-Mails Show Naked Shorting, Filing Says*, Bloomberg (May 16, 2012), available at http://www.bloomberg.com/news/2012-05-15/goldman-merrill-e-mails-show-naked-shorting-filing-says.html ["fails to deliver in Overstock shares correspond to market-makers Scott Arenstein and Steven Hazan, Overstock's lawyers said in the filing"].)

To the extent these exhibits concern Arenstein, Hazen and Overstock, the trial court properly refused to seal this information, given the extent of the public information about Arenstein's and Hazan's trading. However, other third party identifying information was of scant, if any, relevance to plaintiffs' summary judgment opposition, and the public's understanding of the adjudicative process is not enhanced by the disclosure of this confidential financial information. Accordingly, **client identifying information (other than as to Arenstein and Hazan) in these exhibits should have been sealed (by redaction if appropriate) under the sealed records rules.**

### iv) *Documents With Irrelevant Client-Identifying Information*

*Exhibit 140 to the Sommer Declaration.* This exhibit is a lengthy spreadsheet reporting details about numerous client trades. Plaintiffs cited to the exhibit to demonstrate the great volume of "fails to deliver" and also to highlight certain trades. Thus, portions of the exhibit were relevant to their summary judgment opposition. However, the client-identifying information in the exhibit was **irrelevant and should have been struck and either removed from the record or sealed (by redaction if appropriate) for good cause.** (See *Apple*, *supra*, 727 F.3d at pp. 1226–1228.)

*Exhibit 150 to the Sommer Declaration.* This exhibit lists five Goldman clients and their short positions in Overstock. Plaintiffs cited to this exhibit, but only to show the fees charged by Goldman. Accordingly, the client-identifying information in the exhibit was **irrelevant and should have been struck and either removed from the record or sealed (by redaction if appropriate) for good cause.** (See *Apple*, *supra*, 727 F.3d at pp. 1226–1228.)

*Exhibit 166 to the Sommer Declaration.* Plaintiffs cited to this exhibit, an email chain, to show that one Goldman client, who had been sanctioned for unlawful short

selling, did not became a paying client. The particular identity of the client, however, was irrelevant to plaintiffs' point, as were the short positions listed. Accordingly, the client-identifying information in the exhibit was **irrelevant and should have been struck and either removed from the record or sealed (by redaction if appropriate) for good cause.** (See *Apple*, *supra*, 727 F.3d at pp. 1226–1228.)

### v) *Other Documents Containing Client Financial Information*

Defendants once again string cite to other exhibits they contend should have been sealed, but provide no separate analysis.[30] Given the significance of the privacy interest at stake, and the fact we have concluded, as to the exhibits defendants have separately discussed, much of the information was irrelevant to plaintiffs' summary judgment opposition and therefore should have been struck or sealed for good cause, we are persuaded defendants have shown a sufficiently erroneous approach prejudicing third parties, **requiring reversal and remand for further consideration of these exhibits**.

Again, the parties may not simply dump these discovery materials back into the lap of the trial court. On remand, they are to proceed as follows: (a) review each of the string cited exhibits in light of the our discussion above of exhibits containing third party confidential financial information; (b) reach agreement to the extent possible as to (1) those exhibits (or *pages* thereof) that were *irrelevant* to plaintiffs' summary judgment opposition (e.g., not cited by plaintiffs, or having no bearing on the point in connection with which the exhibits were cited by plaintiffs) and which therefore should have been

---

[30] Goldman cites to: "Sommer Declaration exhibits 4, 7-8, 15-16, 18, 20-21, 33, 46-48, 59, 70, 75-76, 105-06, 111-12, 116-17, 135, 137-40, 149-50, 166-67, 193, 207, 209-10, 214, 216, 220, 222, 227-28, 232-38, 243-44 (CA 32:C7445-44:C10677); Allaire Declaration and exhibits B, C-1-C-5, C-8-C-12, C-18, C-19, F (CA 3:C647-9:C2061); and those portions of the other opposition and reply papers that disclose their content."

Merrill cites to: "Cirangle exhibits 4, 5, 7, 8, 10, 11, 13-18, 21, 23-31, 34, 36-40, 44, 45, 47, 49, 50, 53-55, 57-60, 62, 63, 65, 70-72, 74, 76, 78-80, 84, 86-94, 99, 102-04, 108, 111, 117-19, 121, 129, 134, 136, 138-41, 151, 161, 164-67, 171, 172, 174, 175-83, 187, 201, 204, 206, 208, 210, and 211; (*see* 13-32 CA C003083-7360); Sommer exhibit 107 (34 CA C008025-28); Banks exhibits 1, 3, 11, 15, 18, 21, and 27; (*see* 60-61 CA 014653-867) and Powers exhibits 1 and 2 (60 CA C014570-612)."

struck and either removed from the record or sealed for good cause, and (2) those exhibits (or pages thereof) that *were* relevant and contain *confidential* third party financial information (i.e., information not already in the public domain) and as to which a sealing determination must be made under the sealed records rules; and (c) return to the trial court on further motions to seal that are focused and limited according.

### e. *Other Lengthy and Almost Entirely Irrelevant Documents*

*Exhibits 207–222 to the Sommer Declaration and Exhibits 192–193 to the Cirangle Declaration.* Exhibits 207–222 are excerpts of 16 deposition transcripts, and Exhibits 192–193 are the entirety of Goldman's responses to all of plaintiffs' 791 requests for admission. In their summary judgment opposition, plaintiffs cited to only snippets of the deposition testimony and a handful of perfunctory admissions. Otherwise, plaintiffs made no reference to this 1,800-plus pages of discovery material. While plaintiffs made a blanket request that the trial court review the "Declarations of [numerous other declarants] . . . and Jonathan Sommer and all exhibits attached thereto and Request for Judicial Notice and all exhibits attached thereto," this sweeping invitation was utterly unhelpful to the court and certainly did not demonstrate any relevancy of the uncited pages of deposition transcripts and admissions. Nor have plaintiffs made any attempt on appeal to explain how the uncited material was relevant to any point they advanced in opposition to the motions for summary judgment. Accordingly, these **irrelevant pages should have been struck and either removed from the record or sealed for good cause**.[31] (See *Apple*, *supra*, 727 F.3d at pp. 1226–1228.)

### F. *The 2011 Sealing Order: The Sealed Allegations of the Proposed Fifth Amended Complaint*

As we observed in footnote four, *supra,* the sealing status of the allegations in the proposed Fifth Amended Complaint is properly addressed in connection with the more-comprehensive 2012 sealing order since the allegations are based on some of the

---

[31] In fact, although the parties fail to mention it in their briefs, the trial court sealed Sommer Exhibits 208 and 215 because they were not cited at all by plaintiffs.

discovery materials covered by that order.  We therefore reverse the 2011 sealing order to the extent it sealed allegations based on summary judgment materials properly ordered *not* sealed by the 2012 sealing order.  In other words, unless the 2012 sealing order, or our disposition on appeal of that order and further remand proceedings, concludes the summary judgment materials underlying the allegations are properly subject to sealing (under either the common law good cause standard or the sealed records rules), then the allegations should not be sealed.

As with other matters to be addressed on remand, the trial court is not to be burdened in the first instance with the task of indentifying which allegations should no longer be sealed.  Rather, after all further proceedings on remand are concluded as to the discovery materials addressed by the 2012 sealing order, the parties are to proceed as follows as to the allegations of the proposed Fifth Amended Complaint:  (a) review the sealed allegations and reach agreement to the extent possible as to which allegations are based on discovery materials either we have concluded were properly ordered *not* sealed by the 2012 sealing order or materials determined on remand that should *not* be sealed, and (b) present the trial court with a focused application to unseal any such allegations.

**G.**     ***Inadvertent Disclosure of Plaintiffs' Trial Court Opposition Memorandum***

We lastly consider whether the inadvertent public disclosure of plaintiffs' trial court memorandum opposing the motions to seal the summary judgment materials has any impact on defendants' appeal from the 2012 order.

By way of background, on April 26, 2012, plaintiffs filed a motion in this court to vacate the trial court's stay of its 2012 order.[32]  On May 11, 2012, defendants filed opposition, which included an *unredacted* copy of "Plaintiffs' Consolidated Opposition to Defendants' Motion to Seal Summary Judgment Papers," which had been lodged conditionally under seal in the trial court.  At pages 14–20, the consolidated opposition cataloged "facts defendants improperly seek to seal."  Defendants served their opposition

---

[32]  Given the size of the record in this case, the significance of the issues, and the discretion committed to the trial court in granting a stay, this motion was wholly without merit.

60

to the motion to lift the stay, including the unredacted copy of plaintiffs' consolidated opposition memorandum, on counsel for the media intervenors.

The media immediately took notice. On May 15 and 16, 2012, articles about the unredacted consolidated opposition memorandum appeared on the websites of *Rolling Stone*, *The Economist*, and *Bloomberg*.[33] Plaintiffs attached copies of these articles to their May 16, 2012, reply in support of their motion to lift the stay.

Meanwhile, by letter dated May 15, 2012, defendants notified this court of the error in appending the un-redacted copy of the consolidated opposition memorandum. And on June 1, 2012, they moved for permission to file a "corrected," redacted version of it. We granted that motion on June 11, 2012. We also stated, however, the "propriety of" the media's disclosure of the unredacted opposition was "not at issue" in connection with the pending motion to file a corrected, redacted copy, and further advised it would be "a subject for the appeal" whether "disclosure of the contents of Exhibit No. 19 [the unredacted consolidated opposition memorandum] renders the appeal moot as to Exhibit No. 19 or its contents." Finally, we ordered "any further references to the contents of the unredacted version of Exhibit 19 shall comply with Rule 8.46(g)." (See former rule 8.46(g) ["A record filed publicly in the reviewing court must not disclose material contained in a record that is sealed, lodged conditionally under seal, or otherwise subject to a pending motion to file under seal."].)

In their appellate briefs, the parties did not address the inadvertent disclosure of the unredacted consolidated opposition memorandum. Accordingly, we sought

---

[33] *The Economist*'s Web site included a copy of the unredacted consolidated opposition, and both *The Economist* and *Rolling Stone* articles provided a hyperlink to it. These articles and the unredacted consolidated opposition remain available on the Internet. Further, while attempting to locate the materials online pursuant to the citations plaintiffs provided, the court found additional news articles about the unredacted opposition and found another copy of it at the scribd.com document repository. In addition, a journal article uses the consolidated opposition to draw conclusions about Hazan and Overstock. (See Charles F. Walker, Colin D. Forbes, *Sec Enforcement Actions and Issuer Litigation in the Context of A "Short Attack"* (2013) 68 Bus. Law. 687, 738.)

supplemental briefing on the impact of its disclosure on the pending appeals in light of court decisions refusing to seal materials already in the public domain, including materials inadvertently disclosed. (See *Doe v. United States Swimming, Inc.* (2011) 200 Cal.App.4th 1424, 1431–1432; *Mercury, supra*, 158 Cal.App.4th at p. 106; *Jackson, supra*, 128 Cal.App.4th at p. 1014; accord, *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.* (4th Cir. 1999) 174 F.3d 411, 419; *Kamakana v. City & County of Honolulu* (9th Cir. 2006) 447 F.3d 1172, 1184.)

We conclude the inadvertent disclosure only minimally impacts our analysis, since sealing was properly denied as to most of the documents discussed in the consolidated opposition. The only exceptions are Sommer Exhibits 20, 53, 63 and 115.

*Sommer Exhibit 20.* We concluded, *supra* at page 39, that the trial court properly refused to seal the top two e-mails of this multi-part exhibit. We also concluded the rest of the exhibit was irrelevant, and thus should have been struck and sealed for good cause. With respect to this exhibit, the consolidated opposition memorandum states it shows "Conley and his team are exploring trades with Arenstein on August 19, 2004." The first two emails are the only parts of Exhibit 20 that reference Arenstein or convey that Conley wished to speak with Arenstein about a matter. Accordingly, the inadvertent disclosure of the consolidated opposition does not compel any further unsealing of the exhibit. (See *Mercury*, *supra*, 158 Cal.App.4th at p. 79 [even where disclosed document had "references to . . . exhibits and in some instances disclose[d] all or substantially all of their substance, it [was] equally clear that significant portions of the substance of the exhibits ha[d] not been revealed" and should not have been automatically unsealed in full].)

*Sommer Exhibit 53*. As noted *supra* at 41, the trial court sealed the final two pages of Exhibit 53, a chart of clients and their positions in stocks with certain rebate characteristics. The consolidated opposition memorandum reveals one piece of client data and one of the "total" figures on that chart. Otherwise, the opposition discloses no further information. Accordingly, only **that data, but no other data on the final two pages of Exhibit 53, should now be unsealed as a consequence of public disclosure.**

62

*Sommer Exhibits 63 and 115.*  The consolidated opposition memorandum only quotes short statements from these exhibits, which we have concluded the trial court properly refused to seal.  Accordingly, the inadvertent disclosure of the opposition has no impact on the outcome as to these two exhibits.

*Exhibits to be addressed on remand.*  As to the exhibits that must be addressed on remand, see discussion *supra* at pages 41–43, 45–46 and 58, the trial court will need to consider the impact of the inadvertent disclosure of the consolidated opposition memorandum.  To the extent any of the information in those exhibits is now in the public domain as a result of the inadvertent disclosure, sealing must be denied.[34]

## IV. DISPOSITION

The August 3, 2011, sealing order challenged in appeal No. A133487 and the March 6, 2012, sealing order challenged in appeal No. A135180 are affirmed in part and reversed in part as specified herein, and limited remands are ordered for further proceedings consistent with this opinion.  The parties are to bear their own costs on appeal.

_____

Banke, J.

We concur:

_____
Margulies, Acting P. J.

_____
Dondero, J.

---

[34]  Plaintiffs' request for judicial notice filed on October 18, 2012, is hereby denied.

Trial Judge:                      The Honorable John E. Munter

Trial Court:                     San Francisco County and City Superior Court

Theodore A. Griffinger, Jr., and Jonathan Edward Sommer and Lubin, Olson, Niewiadomski LLP for Plaintiffs Overstock.com, Inc., et al.

Joseph Edward Floren and Morgan, Lewis & Bockius for Defendants The Goldman Sachs Group, Inc., et al.

Matthew David Powers, Andrew J. Frackman, and Abby F. Rudzin and O'Melveny & Myers for Defendants Merrill Lynch, Pierce Fenner & Smith, Inc.

Karl Olson and Ram, Olson, Cereghino & Kopczynski for Interveners The Economist Newspaper et al.